In re The **CONTESTS OF the CITY OF LAREDO, et al., TO the ADJUDICATION OF WATER RIGHTS IN the MIDDLE RIO GRANDE BASIN AND CONTRIBUTING TEXAS TRIBUTARIES.**

**No. 13917–B.**

Court of Appeals of Texas, Austin.

June 20, 1984.

Rehearing Denied Aug. 22, 1984.

Frank R. Booth, Booth, Lloyd & Simmons, Austin, for appellant.

Jim Mattox, Atty. Gen., Richard Lambeth Townsend, Asst. Dist. Atty., Austin, R. Glenn Jarvis, Ewers, Toothaker, Ewers, Abbott, Talbot, Hamilton & Jarvis, McAllen, for appellee.

Before SHANNON, POWERS and BRADY, JJ.

SHANNON, Justice.

The City of Laredo appeals from the judgment of the district court of Travis County which affirmed, in large part, the final determination by the Texas Water Rights Commission of claims of water rights in the Middle Rio Grande.

The "Middle Rio Grande" includes the Rio Grande and contributing Texas tribu-

taries from Amistad Dam, in Val Verde County, downstream to Falcon Dam, in Starr County, and includes all or parts of Val Verde, Kinney, Maverick, Webb, Zapata, Edwards, Dimmit, and Jim Hogg Counties. Users of state water within this area are the Cities of Laredo, Eagle Pass, and Del Rio, several smaller towns and unincorporated communities; those using water for irrigation, industrial and mining purposes; and recreational developments around Falcon Reservoir. Specifically, Laredo complains of the judgment in its affirmance of the Commission's refusal to recognize Laredo's claimed pueblo water right.

This Court will affirm the judgment of the district court.

■■■ The primary question in this appeal is whether the law of this State recognizes the pueblo water rights doctrine. The pueblo water right is the paramount right of a town or city of this country as successor of a Spanish or Mexican pueblo, to the use of water naturally occurring within the old pueblo limits for the use of the town or city and its inhabitants. The pueblo water right, at least in California law, is expandable as the size of the successor-town or -city increases. The pueblo water right dates from the time of the establishment of the pueblo, and it is superior to that of any prior appropriator or riparian proprietor. W. Hutchins, Water Rights in the 19 Western States pp. 145–171. The Supreme Courts of California and New Mexico have recognized and applied the concept. The existence *vel non* of the pueblo water right has not been previously litigated in Texas.

Laredo contends in this appeal that under the law of New Spain a town established upon the banks of a river had a right to use all the water that was necessary for domestic and municipal purposes. The right to the water for municipal or domestic purposes was part and parcel of the existence of the pueblo without need for documentation and superior to all other water rights. According to Laredo's view, the pueblo water right was on the same footing as the holding of squares, market-places, and commons, which according to Spanish law belonged in common to a town and to its inhabitants and existed for the general benefit of the community. The pueblo government was the custodian and protector of the pueblo water right. Laredo insists that its pueblo water right was granted by the Spanish king in 1767 by virtue of the act of the General Visita. It is undisputed that the City of Laredo is the direct successor of the pueblo of Laredo as confirmed by the General Visita.

■■■ The law controlling the disposition of this appeal is the law of the granting sovereign. That law is not foreign law. As the law of the former sovereign, it is the law of Texas, which the courts of this state have a duty to know and follow. In re: The Adjudication of Water Rights in the Medina River Watershed of the San Antonio River Basin, 27 Tex.Sup.Ct.J. 356 (May 5, 1984); *State v. Valmont Plantations*, 346 S.W.2d 853 (Tex.Civ.App.1961), opinion adopted, 163 Tex. 381, 355 S.W.2d 502 (1962); *State v. Cuellar*, 47 Tex. 295, 303 (1877). When Laredo was established in the middle of the eighteenth century, what is now Webb County was a part of the Spanish Empire subject to the laws of Spain and New Spain.

## LAW OF ROME

The Spanish law of waters in effect when Spanish and Mexican titles were issued to lands situated in the former Mexican States of Coahuila, Texas, and Tamaulipas was the law as declared in Las Siete Partidas, which was taken almost bodily from the Roman law; and, more particularly, from the Institutes of Justinian. *Manry v. Robison*, 122 Tex. 213, 56 S.W.2d 438 (1932); *Miller v. Letzerich*, 121 Tex. 248, 49 S.W.2d 404 (1932); *State v. Grubstake Investment Corp.*, 117 Tex. 53, 297 S.W. 202 (1927); Davenport & Canales, *The Texas Law of Flowing Waters with Special Reference to Irrigation from the Lower Rio Grande*, 8 Baylor L.Rev. 138, 157 (1956).

There was never in Spain, nor in New Spain, a cohesive body of judicial precedents interpreting the law and recording its growth; hence, there is no background of adjudications to aid in difficult interpretations. The only authorities available are the opinions of noted law writers, Juris Consults, who usually refer to the parent Institutes and Pandects of Justinian for purposes of clarification where the text of Las Siete Partidas is unclear. Davenport & Canales, *supra* at 158.

The law of waters, now applicable in Texas, has developed through successive stages from its original source in Roman law. The basic rule of Roman law, as stated in the Institutes of Justinian was: "By natural law these things are common to all; air, *running water*, the sea, and as a consequence, the shores of the sea." Davenport & Canales, *supra* at 159 (quoting Book II, Title I, of the Institutes of Justinian: "Of The Different Kinds of Things." Translated by J.B. Moyle).

Roman law distinguished the right to use of water from ownership of the water itself. While the naturally flowing water thus was without an owner and no one's property, the civil law recognized a right of property in its use, a usufruct. This usufruct belonged to those who had access to the water, and only those who had access to it by virtue of ownership of riparian land could take and use it. Davenport & Canales, *supra* at 159.

## LAW OF SPAIN

The laws of Spain are evidenced by the (1) codes, (2) regional laws, (3) decrees of the king contemporaneous to the Spanish grants involved, and (4) the decisions of the Supreme Court of Spain. *State v. Valmont Plantations, supra.* The decrees of the king, from time to time, were collected and codified. *Id.* at n. 4.

"Las Siete Partidas" compiled by order of Alfonso the Wise of Castile between 1256 and 1263 A.D. was the embodiment of "Spanish Civil Law," particularly after enactment of Ordenamiento de Alcala in 1348. Las Siete Partidas reflects the Roman law

as modified by custom and usage in medieval Spain translated into Spanish. Davenport & Canales, *supra* at 158.

Though modified in practice by new world uses and customs arising out of pioneer conditions under which the land and waters, remained for the most part unsevered from the public domain, and belonged under the Spanish jurisprudence to "His Majesty, the King," the law as decreed in Las Siete Partidas continued to be the basic law of Mexico and generally in New Spain, and so remained, in the new Mexican State of Tamaulipas, until the adoption of its first civil code in 1871. Where the law, as stated in Las Siete Partidas, seemed unclear or uncertain the usual Spanish practice was to resort to the Institute or Pandects of Justinian. Davenport & Canales, *supra* at 165.

## LAW OF NEW SPAIN

Four centuries passed between Alfonso's promulgation of Las Siete Partidas and the codification of laws which boldly proclaimed to have been enacted "for the good government and administration of justice" in the Indian colonies of the crown. The law of Spain, meantime, had crossed the seas and had become "the Laws of Spain and the Indies" in a new and fast developing world. In the new world, as in the old, Las Siete Partidas was, where applicable, the ruling law. But the Partidas were framed for a settled civilization in which titles to land had nearly all passed from the crown. In New Spain, deficiencies, as applied to pioneer conditions, were supplemented of necessity by custom, usages, and practice where, as in Mexico, the greater portion of the land, as well as of the flowing water was held in nominal proprietorship by the Spanish king. Davenport & Canales, *supra* at 173.

In 1520, the king created the Council of the Indies to cope with the problems encountered by the colonists. *State v. Valmont Plantations, supra* at 859. The decrees of the Council governed New Spain and, because of the crown's firm support, laws poured forth profusively from the

Council. *Id.* Codifications occurred from time to time such as the 1680 collection entitled Recopilacion de las Leyes de las Indias. *Id.* This work contains the most complete description available of the duties owed by the colonists to the king and the correlative rights to which they became entitled in the new world. Rigid and detailed procedures were prescribed to the settlers and described in the Recopilacion.

The Recopilacion remained the law of New Spain up until and beyond 1761, at which time the Viceroy authorized publication of "Reglamento General de las Medidas de Aguas" or General Regulation for the Measurement of Waters. This commentary, written by Lasso de la Vega, was reprinted in Galvan, Ordenanzas de Tierras y Aguas (Mexico 1844). The General Regulation served to emphasize that the right to distribute water in New Spain belonged "to the Prince, and to no other." *State v. Valmont Plantations, supra* at 863; *see* Davenport & Canales, *supra* at 168–173.

Although by the law of nations, settlements may be formed without the necessity of previous permission from any power, nevertheless, this was not permitted in Spain, at least not after the promulgation of Las Siete Partidas and the Ordenamiento Real (1490). In both codes the formation of towns was prohibited, unless the license of the king was obtained, to whom the lands acquired in just war belonged, as the prerogative of the crown; and for this reason, the Kingdom of Spain was named the Royal Inheritance, and all that it contained was considered as lands belonging to the monarch. Leonidas Hamilton, Mexican Law, A Compilation of Mexican Legislation (1882).

The Recopilacion de Los Leyes de Las Indias established the procedure for establishing towns in New Spain and apportioning lands to towns and their inhabitants. Those laws, in large part, may be found in the following authorities. Royal Regulation of October 15, 1754; 2 White, Rec. 62; Book 4, tit. 12, Laws 2–5, 8, 11, 12; 2 White, Rec. 48; Hall, Mex.Law, 17–38. *See*

*Texas Mexican Railway Company v. Jarvis,* 69 Tex. 527, 7 S.W. 210 (1888).

"These [early colonial] settlements have held from their origin different names . . .; and such names were understood as a declaration of their importance and place among others; and their privileges, and limitations, were designated in the respective titles upon which they were founded, said titles being granted by the sovereign; the said privileges and limitations, being similar to that which is this day termed town privileges, or pueblo licenses. . . . Having discovered the Western Indies in the 16th Century and conquered them by the Royal Catholic arms of Don Fernando and Dona Isabel, and in conformity with the principles enunciated which have been established in the ancient laws of Spain, that ownership and full dominion thereof was fully established in the conquered kingdoms belonging to the monarchies; and in consideration, that a person cannot live without sustenance, likewise no city can subsist without an income; His Majesty was pleased to grant to the settlements of America, and to their representatives, (a los consejos de ellas) in the nature of a gift or town privilege, a certain portion of the lands in order that they might secure their subsistence and improve their circumstances, holding a usufruct on the pasture and cultivated lands, or in any manner which their Municipal Ordinances should dispose." Leonidas Hamilton, Mexican Law, A Compilation of Mexican Legislation (1882). Part V, tit. I, ch. 1, pp. 96–97.

"Another part of the lands was divided by concession of the kings, among those who served the conquerors, as remuneration for their services and were also sold to Spanish subjects, or certain persons for a stipulated price to be paid to the crown. The lands granted or sold were called,—as in fact they were—of private ownership, (de dominio particular) since the transfer of the same was complete, when granted or purchased, and truthfully were of private ownership (propiedad de particulares)." Leonidas Hamilton, Mexican Law, A Compilation of Mexican Legislation (1882). Part V, tit. I, ch. 1, p. 97.

"The oldest law which is embodied in Mexican Law is in the first of Title 12, Book 4 of the Recopilacion de Indies, adopted in the time of King Don Fernando the V. in Valladolid, June 18, 1513 the literal tenor of which is as follows: 'in order that our vassals who sailed to discover and people the Indies, should live with comfort and convenience, which we desire; it is our will that they should distribute, and have distributed among all, who are to settle new lands into towns and settlements, (pueblos y lugares) houses, fifty vara lots, (solares) lands, caballerias and peonias, which shall be designated to them by the governor of the new settlements, making distinction between gentlemen of illustrious ancestry (escuderos) and peons; and between those of lesser grade, and merit, and their superiors; and those of highest merit; in accordance with the quality of their services, in order to watch over their culture and education; and having made in said pueblos their residence, and cultivated them, and resided in them for four years, we concede to them the power from thenceforth to sell, or hold them of their own free will as their own property....'" Leonidas Hamilton, Mexican Law, A Compilation of Mexican Legislation (1882). Part V, tit. I, ch. 2, p. 98.

"The manner and formulas to be observed in the denouncement, acquisition and possession of public lands and water privileges, as well as the titles to the same was (sic) further set forth, in the Recopilacion de las Indies, particularly in Title 12, Book 4 of the same, which was adopted on May 18, 1680 in the reign of Charles II. This collection embodied all the colonial laws that had been issued and, in the matter of the Civil Law of Spain, required in laws 1 and 2, title 1 of book 2 that in cases where the Recopilacion de las Indies had no provision relating thereto that the Laws of Castile must be observed, thus making the civil law of Spain apply as well to America, but only in those cases where a Cedula to that effect had been issued by the Council of the Indies, setting forth what provisions were to be made applicable.... The Royal Prerogative was however especially extended to the acquisition of public lands and water rights in America, and in said collection of laws, it [was] further provided that those who should solicit (solares) lands, and water, must within a certain period of time take possession of the same, if they desired protection as proprietors." Leonidas Hamilton, Mexican Law, A Compilation of Mexican Legislation (1882) (quoting from Galvan's Ordenanzas de Tierras y Aguas, and General Laws of the Republic). Part V, tit. I, ch. 2, pp. 98–99.

## THE FOUNDING OF LAREDO

The earliest titles to lands in that portion of Texas which was once a portion of the Mexican state of Tamaulipas, and prior thereto, of the Spanish province of Nuevo Santander, were the porciones, or head-rights, granted to pioneer settlers of the Rio Grande towns of Reynosa, Camargo, Guerrero, Mier and Laredo by the Spanish Government in 1767, by the Actas Visita-General, or "Acts of the General Visit." Davenport & Canales, *supra* at 146.

As previously written, Laredo was founded on the banks of the Rio Grande on May 15, 1755 by Tomas Sanchez under the direction of Jose de Escandon, governor of the state of Nuevo Santander in New Spain. Twelve years later, in 1767, Laredo was confirmed as a Pueblo and received from the Crown a grant of four leagues of land on the banks of the Rio Grande. This grant followed a visit by a Royal delegation, who conducted similar business in four other Rio Grande colonies. The work of the delegation was reduced to a document referred to as the "Visita-General" or acts of the general visit. The visita was ratified and confirmed by a patent from the government of Texas after its separation from Mexico. On a portion of this tract, along and back from the river bank which marks the line of "high water," a regular city was laid out in the year 1767, as shown by the "Visita-General," with blocks, lots, and streets running to the cardinal points of the compass. Additional blocks, lots, and streets were subsequently laid off, surveyed, and platted on the map, as the wants of the inhabitants demanded or public interest required; while that part of the

grant not embraced in the limits of the city has been disposed of or is still retained as property of the city. *City of Laredo v. McDonnell*, 52 Tex. 511, 522 (1880). A remarkable description of the 1767 "Visita-General" to Laredo was written by Judge Stayton in *Texas Mexican Railway Company v. Jarvis*, 69 Tex. 527, 7 S.W. 210 (1888).

## RIGHTS TO THE WATERS OF THE RIO GRANDE

It may not be presumed that the Crown intended that its early settlements should be prohibited from using the waters of the streams and rivers upon which they were founded. To the contrary, the Recopilacion instructed early colonizers to consider access to ample quantities of water for drinking and irrigation when choosing settlement sites. Rec., Book IV, tit. 5, Law 1;[1] Book IV, tit. 7, Laws 1;[2] Book IV, tit. 7, Law 3;[3] Book VI, tit. 3, Law 8.[4] In addition, pueblos were ordered to be founded near *navigable* rivers in order that they

1. We order that it having been decided to colonize a certain province or district from those that are under our rule, or that may be discovered later, the colonizers shall take consideration and special notice that the land is healthful, noticing if it has old men and young men of good complexion and disposition; if the animals and cattle are sound and of good size, and the fruits and sustenance good and abundant, and is of land appropriate for planting and harvesting; if there are poisonous and noxious things; the sky is fair and pleasant, clear and benign, the air pure and gentle without impediments or changes, the climate without excess of heat or cold (and if it inclines toward one or the other quality, the cold should be chosen); if there are pastures for grazing cattle, woods and forests for firewood, materials for houses and buildings, plenty of water for drinking and for irrigation; Indians and natives to whom the word of God may be preached, as the first motive of our intents; and having found these or most of these principal qualities coming together, they may proceed with the colonizing, observing the laws of this book.

2. Discovery having been made by sea or land, in conformance to the laws and ordinances which treat thereof, and the province or district which is to be colonized having been chosen, and the place where the new towns are to be established, and a contract having been made concerning it, those who would take to fulfill the same shall observe the following form: on the seacoast, let the site be elevated, healthful and secure, taking into account the protection, depth, and defense of the port, and if possible that it not have the sea at the south or the west: in these and in other inland towns, the site selected shall be from those that are vacant, and by our disposition can be occupied without prejudice to the Indians and natives, or with their free consent: and when they make the plan for the settlement, they shall divide it off into the plazas, streets, and building sites by line and rule, beginning from the main plaza, and laying out from the streets to the gates and principal roads, and leaving enough space so that, even though the town may continue to grow, it can always continue and expand in the same form. They shall try to have their water close by, and that it can be brought to the town and fields bringing it forth if possible, in order to make better use of it, [procuren tener el agua cerca, y que se pueda conducir al Pueblo y heredades, derivandola si fuere posible y para mejor aprovecharse de ella] and the materials necessary for building, tillable lands and pastures, which will avoid the great labor and costs of bringing them from a distance. Town sites shall not be chosen in places of great altitude because of the buffeting of the winds and the difficulty of service and hauling, nor in places too low, because they usually are unhealthful; they should be at medium altitude and open to the north and west winds; and if mountains or hills are nearby, they should be to the east or south; and if it is not possible to avoid high places, establish the towns where they will not be subject to fogs, paying special attention to what is most convenient to health and accidents that may occur; and in case of building on the bank of a river, locate the town so that the sun shines first on the town rather than on the river.

3. We order that the land and surroundings which are to be settled shall be chosen insofar as possible, from the most fertile, abundant in pasture, firewood, timber, metals, fresh water, native inhabitants, roadways, and access, and not be near lagoons or swamps infested with venomous animals, nor should there be corruption of air or waters.

4. "That the reductions [settlements?] be made in accordance with this law."

The places where the settlements [Pueblos e y reduciones] shall be established should have the commodities of water, lands and woods, entrances and exits, the farmlands, and a commons measuring one league in length, where the Indians may have their game, without getting mixed up with the other Spanish game. [translation: City of Laredo's translation.]

might have *better trade and commerce.*
Rec., Book IV, tit. 7, Law 5.[5]

With regard to public or navigable streams and rivers the king could, and sometimes did, grant the use of a portion of their waters to owners of land not strictly riparian; but this was not to be done in derogation of the paramount public interest in the navigation of the stream. Navigation received, always, first consideration; *other uses* of waters of navigable rivers and streams *depended,* unless circumstances were exceptional, *on legal access to the water of the stream.* Davenport & Canales, *supra* at 166. (emphasis added)

The laws concerning the creation of pueblos provided for a system of *express* grants of lands and lots to the early inhabitants. Rec., Book IV, tit. 7, Law 11.[6] If use of the lands granted were not made

within three months of their distribution, the tracts were subject to forfeiture and redistribution. Rec., Book IV, tit. 12, Law 11.[7]

The Recopilacion also speaks to the distribution of "waters" to early settlers. The early Spanish Viceroys were empowered to grant "waters" to early settlers. Rec., Book IV, tit. 12, Law 4.[8] These "grants" had several significant qualities: they were not to be given to the prejudice of third persons; they were related, presumably in size, to the "situation of the land"; and they were subject to temporal limitations. *Id.* The early express grants of water were obtained through a formal system that included that the grantee petition the "council" of the settlement, Rec., Book IV, tit. 12, Law 8;[9] this governing

**5.** Because it will be of great convenience to found pueblos near navigable rivers in order to have better trade and commerce, as the maritime ones, we order that they be so built, if the site permits it, and that the places for slaughtering, fish cleaning, tanneries, and other works which cause uncleanliness and stench shall be located toward the river or ocean in order that the settlement can be conserved with greater cleanliness and sanitation.

**6.** "The lots to be distributed by lot."
The lots shall be distributed among the settlers by lot, beginning with those adjoining the main square, and the remainder shall be reserved to us, to give, as rewards, to new settlers or otherwise, according to our will; and we command that a plan of the settlement be always made out. [translation: Joseph M. White, A New Collection of Laws, Charters, and Local Ordinances of Great Britain, France, and Spain (Philadelphia, T. and J.W. Johnson 1839) Vol. 2, at 46.]

**7.** "Possession to be taken of lands distributed within three months, and plantations made, under penalty of forfeiture."
All the settlers and housekeepers to whom distribution of lands shall be made, shall, within three months which shall be stipulated, take possession of the same; designate their confines and the boundaries which separate them from other lands, by planting, in the proper season, willows and other trees, in such a manner that, besides a correct and agreeable laying out of said lands, they may avail themselves of the timber which they may want; under penalty, if, after the expiration of said town they shall not have planted the aforesaid boundaries, of forfeiting the land that the same may be vacated and granted to some other settler. This shall be done, not only with regard to the lands, but

likewise with regard to the settlements and improvements which they may hold and be possessed of, within the limits of towns and villages. [translation: White, supra at 51.]

**8.** "The viceroys to have power to grant lots and lands to settlers."
If, in those parts of the Indies which are already discovered there should be any sites and districts sufficiently good to render it expedient to settle the same, and if any person should apply to form settlements therein, in order that they may do so with zeal and profit, the viceroys and presidents shall, in our name, grant them lots, lands, and waters, taking into consideration the situation of the land; provided it be not to the prejudice of any third person, and that said grants be for such a period as we shall determine. [translation: White, supra at 50; *see also* Valmont at p. 860.]

**9.** "Declaring to whom application is to be made for lots, lands, and waters."
We command that if petitions be presented asking for lots or lands in any city [ciudad] or village [villa] where our audience shall reside, such petitions shall be addressed to the council [cabildo], who having considered the same, shall name two deputy regidores, who shall inform the viceroy, or president of the opinion of the cabildo; and the same having been seen by the viceroy, president and deputies, the order shall be issued, signed by all and in the presence of the clerk of the cabildo, to be entered into the record of the cabildo. And if such petition be for distribution of waters and of lands calculated for the erection of mechanical engines; it shall first be presented to the viceroy or president, who shall refer it to the cabildo; whence after due examination, notice shall be given by

body, in turn, advised the Viceroys of the manner of distribution to be followed. *Id.;* Book IV, tit. 12, Law 5.[10]

Two related principles also emerge from an examination of the Recopilacion. First, those lands, lots, and waters not expressly granted by the Viceroy remained the property of the Crown. Rec., Book IV, tit. 7, Law 11. These properties and waters were subject to common use by all inhabitants of the land, Rec., Book IV, tit. 17, Law 7;[11] *State v. Valmont Plantations, supra,* and the disregard of these rights in common to all was punishable by fine. Rec., Book IV, tit. 17, Law 5.[12] This privilege in the com-

mon use of flowing waters predates the Recopilacion and may be traced to at least as early as Las Siete Partidas which provided as follows:

> The air, rain, flowing water, the sea, and consequently, the shores of the sea, belong in common to all living creatures and every creature may use them according to its needs. Partida 3, Title 28, Law 3. Rivers, ports, and public roads belong to all men in common. Partida 3, Title 28, Law 5.[13]

■ Second, the Crown expressed extraordinary concern for the rights and privileges held by the Indians. Rec., Book IV,

a regidore to the viceroy or president, who after having considered the same, shall give such orders as may be deemed expedient. [translation: White, supra at 51; *see also Valmont* at p. 860.]

10. "The distribution of lands to be made by the advice of the cabildo, and to the regidores in preference."

In distributing the lands, waters, watering places, and pastures, among the settlers, the viceroys or governors thereto authorized by ourselves shall make such distribution by the advice of the cabildo [council] of the cities or villages, taking care that a preference be given to the regidores, if they do not possess an equivalent quantity of land and lots. The Indians shall be left in possession of their lands, heredit-aments [heredades], and pastures, in such a manner that they shall not stand in need of the necessaries of life, and shall be allowed all the aid and facilities for the sustenance of their household and families. [translation: White, supra at 50; *see also Valmont* at p. 860.]

11. "That the woods and pastures within domains of lords be also common properties."

The woods, pastures, and waters within the towns [lugares] which have been made, or which we shall make, a part of domains of feudal lords in the Indies, and the woods contained within grants therein, shall continue to be common to Spaniards and Indians, and we command the viceroys and audencias to cause this to be observed and that they comply. [translation: Collection of Spanish Laws, supra at 70; *see also Valmont* at p. 860.]

12. "Pastures, mountains, waters, and limits, to be common; and provisions to be observed in the island of Hispanola."

We have ordained, that pastures, mountains, and waters, shall be common in the Indies: and whereas some persons, without any title from us, have occupied extensive tracts of land, and

will not permit anyone to establish pens and herdsmen's huts thereon, and to drive their cattle thither, we command that all pastures, mountains, and waters, in the provinces of the Indies, be common to all the inhabitants thereof, present and to come, and that they may freely enjoy the use of them, and construct their huts near their pens, drive therein their cattle, either in herds or separately, at their option, all ordinances to the contrary notwithstanding; which, if necessary for this object, or hereby, sofar repealed, and declared to be of no force or value. And we command all councils, justices, and regidores to observe and fulfill the provisions of this our law; and all persons who shall hinder their execution, shall incur a fine of 5,000 ounces of gold, to be levied on their persons and property, for the benefit of our chamber [camera].... [translation: White, supra at 56; *see also Valmont* at p. 857, 860.]

13. [Note: in the 1931 translation of Las Siete Partidas by Samuel Parson Scott for the Comparative Law Bureau of the American Bar Association, the things which belong to all creatures in common (Partida 3, Title 28, Law 3) are defined as "air, rain-water, and the sea and its shores." *Cf.* the translation given above.

However, Partida 3, Title 28, Law 5 under this translation, provides that "rivers, harbors and public highways belong to all persons in common, so that parties from foreign countries can make use of them, just as those who live or dwell in the country where they are situated. And although the banks of rivers are, so far as their ownership is concerned, the property of those whose lands include them, nevertheless, every man has a right to use them, by mooring his vessels to the trees, by repairing his ships and his sails upon them, and by landing his merchandise there; and fishermen have the right to deposit their fish and sell them, and dry their nets there, and to use said bank for every other purpose like these which appertain to the calling and trade by which they live."]

tit. 5, Law 6;[14] Book IV, tit. 12, Law 18;[15] Book VI, tit. 3, Law 8.[16] Many of the above-stated tenets are inconsistent with the pueblo water rights doctrine.

■ An examination of the Recopilacion and Las Siete Partidas does not, and the parties have not directed our attention to any indication or reference to a paramount water right of a Spanish pueblo. The act of the General Visita of 1767 did not purport expressly to grant such a water right to the Pueblo of Laredo. Accordingly, if such a right is to be recognized by this Court, it can only be through implication.

In *State v. Valmont Plantations, supra,* the controlling question was whether the Spanish and Mexican laws recognized riparian irrigation rights in the absence of specific rights to irrigate. The Court wrote:

> We arrive therefore at our conclusions about the Spanish and Mexican law. The trial court's first conclusion of law, that a specific Spanish or Mexican grant of Rio Grande waters was necessary for irrigation waters is sound. That conclusion finds support in the decree of the King, the Codes, the commentators, Escriche excepted, and the legal experts. The acts done in making the Lower Rio Grande grants refute any intent to grant waters with the land.

*State v. Valmont Plantations, supra* at 878.

The Court's scholarly and studied refusal to recognize implied irrigation rights in Spanish and Mexican grants in *State v. Valmont Plantations* would seem, by analogy, to preclude any recognition by this Court of an *implied* grant of municipal water rights.

In addition, the Supreme Court in *Medina River Watershed* recently held that a Mexican land grant in Bexar County carried no implied right to the waters of a

**14.** "Agreements for the founding of cities with ordinary alcaldes and regidores to be made according to this law."

If the situation of the law be adapted to the founding of any town to be peopled by Spaniards, with a council of ordinary alcaldes and regidores; and, if there be persons who will contract for their settlement, the agreement shall be made upon the following conditions: That, within the prescribed time, it shall comprise at least 30 heads of families, each of whom [is] to possess a house, 10 breeding cows, four steers, or two young steers and two young bullocks, a breeding mare, a breeding sow, 20 breeding ewes from Castile, and six hens and a cock; he shall, moreover, appoint a priest to administer the sacraments, who the first time shall be of his choice, and, afterwards, according to our royal patronage: he shall provide the church with ornaments and articles necessary for Divine worship; and he shall give bond to perform the same within said period of time; and if he fail in fulfilling his agreement he will lose all that he may have built, worked, or repaired, which shall be applied to our royal patrimony, and incur the forfeiture of 1,000 ounces of gold to our chamber [camera]; and if he should fulfill his obligations there shall be granted to him four square leagues of territory, either in a square or lengthwise, according to the quality of the land, in such a manner, that, when located and surveyed, the four leagues shall be in a quadrangle, and so that the boundaries, of said territory be at least five leagues distant from any city [ciudad], town [villa], or

village [lugar], inhabited by Spaniards, and previously settled, and that it cause no prejudice to any Indian tribe [pueblo de Indios], nor to any private individual. [translation: White, supra at 44.]

**15.** "Lands to be left in possession of the Indians."

We command that the sale, grant and composition of lands be executed with such attention, that the Indians shall be left in possession of the full amount of lands belonging to them, either singly or in communities, together with their rivers and waters; and the lands which they shall have drained or otherwise improved whereby they may, by their own industry, have rendered them fertile, or reserved in the first place, and can in no case be sold or aliened. And the judges who shall have been sent thither, shall specify what Indians they may have found on the land, and what lands they shall have left in possession of each of the elders of tribes, caciques, governors, or communities. [translation: White, supra at 54.]

**16.** "That the Reductions be made in accordance with this law"

The places where the settlements shall be established should have the commodities of water, lands and woods, entrances and exits, and farmlands, and a commons measuring one league in length, where the Indians may have their game, without getting mixed up with the other Spanish game.

non-perennial stream crossing the lands of the grant.

De la Vega's commentary, written six years after settlers arrived in Laredo and six years before the General Visita to the Rio Grande colonies, underscores the conclusion that the king retained *title* to the waters of the Rio Grande in the absence of a *specific grant* providing otherwise. The Reglamento General provided:

And limiting myself to waters, as a guide and foundation of all this reglamento, I find taht they are in the same manner of the Royal Patrimony, as the other things, that as such they are annexed to or incorporated in his Royal Crown, and therefore are called realengos, to such an extent that to possess them it is necessary that the private possessor allege and prove that these things have been conceded to them by a special grant (merced) from the same king and Catholic Masters, or in their name; because the law says: Only the Prince and no one else has the right to grant water, and so we must consider null and void the quasi-possession to which we find regalia, be they by measure or in other form, if the Royal Hand has had no part in the distribution.

\* \* \* \* \* \*

The guide and fundamental principle, throughout the whole of the regulation will be found to be, that like the others this belongs to the Royal patrimony, that all such property is annexed to, or incorporated into the Royal Crown, denominated herein Royal patrimony, to such a degree that in order to hold possession, it is necessary that individual possessors, must allege and prove that they have been conceded by especial favor of the same Kings and Lords, or in their name, because as the law declares: That to the Prince, and to no other, appertains the right of distribution of water. Galvan, Ordenanzas de Tierras y Aguas (Mexico, 1844) 155; Hamilton, Mexican Law (1882) 110.

*State v. Valmont Plantations, supra* at 861, 863.

Moreover, the only reference in support of the pueblo water rights doctrine in Spanish legal commentaries to which the parties have directed the Court's attention is the statement by Joaquin Eschriche with respect to rivers that:

If they are navigable, nobody can avail himself of them so as to hinder or embarrass navigation; but if they are not, the owners of the land through which they pass may use the waters thereof for the utility of their firms or their industry, *without prejudice to the common use or destiny which the towns on their course shall have given them* . . . . (emphasis added)

Escriche, Diccionario Razanado de Legislacion Civil, Penal, Commercial y Forense, "Of the Waters Which Belong to the Public" (1847); *See State v. Valmont Plantations, supra* at 867.

Escriche's views were completely disregarded by the court in *State v. Valmont Plantations, supra*. After a close inspection and comparison of Spanish law with the writings of this commentator the court concluded that Escriche described the law as he believed it should be, rather than as it actually existed. *See State v. Valmont Plantations, supra* at 867–869.

Laredo suggests that in resolving the question of pueblo water rights this Court should be guided by the reasoning of the courts of California and New Mexico.

## LAW OF CALIFORNIA AND NEW MEXICO

The pueblo water rights doctrine first appeared in the courts of the United States as dicta in an early California opinion, *Lux v. Haggin,* 69 Cal. 255, 4 P. 919 (1884). Under the Mexican law, opined the Supreme Court of California, each pueblo was a quasi-public corporation having a right, by reason of its title to the four leagues of land set apart for its use, to the use of the waters of the stream on which it was situated, and was vested with power to provide for a distribution of the waters to those for whose benefit the right and powers were

conferred. *Id.* The court reasoned by analogy to an earlier opinion involving lands of the Pueblo at San Francisco in which water rights were not involved. *Hart v. Burnett,* 15 Cal. 530, 542, 573 (1860).

Under the California doctrine, the pueblo water right has been construed to grow with the needs of an expanding town or city. Not only are the inhabitants of the area constituting the old pueblo entitled to enjoy the full pueblo right, but the right grows both with the number of inhabitants to whatever extent increased, and with the extension of the city limits by annexation of land not within the limits of the original pueblo. *Los Angeles v. Pomeroy,* 124 Cal. 597, 649–650, 57 P. 585 (1899); *Los Angeles v. Hunter,* 156 Cal. 603, 608–609, 105 P. 755 (1909). The right extends to so much of the waters of the stream "as the expanding needs of such city" require. *San Diego v. Cuyamaca Water Co.,* 209 Cal. 152, 164, 287 P. 496 (1930). As a result, this characteristic of the pueblo water right ensures a water supply for an expanding city. *Los Angeles v. Glendale,* 23 Cal.2d 68, 75, 142 P.2d 289 (1943). A successor city possessing a pueblo water right is entitled to use the water therefrom only within the city limits. *Feliz v. Los Angeles,* 58 Cal. 73, 79–80 (1881); *Vernon Irrigation Co. v. Los Angeles,* 106 Cal. 237, 250–251, 39 P. 762 (1895). The right relates to the use of water necessary for the inhabitants' of the successor city and for all ordinary municipal purposes. *Los Angeles v. Los Angeles Farming & Mill Co.,* 152 Cal. 645, 652, 93 P. 869, 1135 (1908); *San Diego v. Cuyamaca Water Co.,* 209 Cal. 105, 122, 287 P. 475 (1930).

The California pueblo water right has been construed to extend to use of all surface and ground waters from the stream that flowed through the original pueblo, *including its tributaries,* from its source to its mouth. *San Diego v. Cuyamaca Water Co., supra* at 151, 287 P. 475; *Los Angeles v. Glendale, supra* 23 Cal.2d at 74, 142 P.2d 289. However, the right does not attach to waters brought into the area from other non-tributary watersheds. *Los Angeles v. Glendale, supra.*

The California pueblo water right has been held superior to riparian rights of other proprietors. *Vernon Irrigation Co. v. Los Angeles, supra,* 106 Cal. at 250, 39 P. 762; *Los Angeles v. Glendale, supra,* 23 Cal.2d at 73, 142 P.2d 289. Moreover, the pueblo water right of the City of Los Angeles is superior to the rights of other appropriators' on the stream. *Los Angeles v. Glendale, supra* at 73, 142 P.2d 289. In *Los Angeles v. Glendale, supra,* the California Supreme Court specifically held that a pueblo water right could not be lost or impaired by non-use or statutory forfeiture.

Only four New Mexico opinions discuss the pueblo water right. *Albuquerque v. Reynolds,* 71 N.M. 428, 379 P.2d 73 (1963); *Cartwright v. Public Service Co. of New Mexico,* 66 N.M. 24, 343 P.2d 654 (1958); *New Mexico Products Co. v. New Mexico Power Co.,* 42 N.M. 311, 77 P.2d 634 (1937); *State v. Tularosa Community Ditch,* 19 N.M. 352, 143 P. 207 (1914).

The only New Mexico opinion of real application to this appeal is *Cartwright,* in which a divided New Mexico Supreme Court held that the doctrine of pueblo water rights applied to the New Mexico city of Las Vegas. A majority of the court found itself "unable to avoid the conclusion that the reasons which brought the Supreme Court of California to uphold and enforce the Pueblo Rights doctrine apply with as much force in New Mexico as they do in California." *Cartwright v. Public Service Co. of New Mexico, supra* 66 N.M. at 80–85, 343 P.2d 654.

As previously written, the question of whether a pueblo water right exists in Texas rests upon an analysis of Spanish law in existence at the time of creation of the pueblo. As a result, decisions of sister states are important to this Court in the resolution of the question in this appeal only to the extent that they illuminate the state of Spanish law at the time of the creation of the Pueblo of Laredo.

Hutchins is critical of the legal foundation of the California pueblo water rights doctrine. He writes:

> In reviewing [the California] decisions, the author's attempt to find any quotations from Spanish or Mexican authorities that would unequivocally portray the policy of the sovereign respecting the Pueblo's rights in the water of the stream on which the Pueblo was situated met with little success.

*Hutchins, supra.* Much reliance is placed upon dicta in *Lux v. Haggin, supra,* wherein the court wrote, "by analogy and in conformity with the principles of [*Hart v. Burnett, supra,*] we hold the Pueblos had a species of property in the flowing waters within their limits," to be held in trust and exercised with respect to the common lands and inhabitants. 69 Cal. at 328–329, 4 P. 919.

The Californian pueblo water rights doctrine also places reliance upon excerpts from the Plan of Pitic (or Pictic), a plan decreed by the King of Spain in 1789 establishing the Pueblo of Pitic in Sonora, Mexico.[17] Two sections of the Plan of Pitic were quoted in the California decision. Both dealt with water distribution within the pueblo; neither section gave the pueblo the right to all stream waters as against non-pueblo users. However, the court quoted a paragraph from Escriche to the effect that owners of lands through which a nonnavigable river passes "may use the waters thereof for the utility of their farms or industry, *without prejudice to the common use or destiny which the Pueblos on their course shall have given them.*"

In reliance upon the scant authority above quoted, the California Supreme Court wrote that it appears that a riparian proprietor could not so appropriate water as to interfere with such common use or destiny and that the pueblos had a preferential right to consume the waters even as against another riparian proprietor. However, the court considered it unnecessary expressly to decide that the pueblos had the preference above suggested inasmuch as there was not a single pueblo located in the disputed area. *Lux v. Haggin, supra.*

The legal principles suggested in *Lux v. Haggan,* were expressly adopted as law in *Feliz v. Los Angeles, supra;* and *Elms v. Los Angeles,* 58 Cal. 80 (1881) (presented on the same facts and submitted on the same arguments as the Feliz case).

In 1899, a divided California Supreme Court injected significant elasticity into the pueblo water right. In *Los Angeles v. Pomeroy, supra,* the court wrote:

> Unquestionably it was contemplated and hoped that at least some [pueblos] would so prosper as to outgrow the simple form of the rural village. It is in the nature of things that this might happen, and when it did, and the communal lands were required for house lots, *we must presume* that under Mexican or Spanish rule *they could be* so converted, and that when the population increased so as to overflow the limits of the Pueblo that such extension could be legally accomplished. Had this happened under Mexican rule, *can it be doubted* that the right vested in the Pueblo *would have been construed to be* for the benefit of the population, however great the increase would be? [emphasis added]

Once again Hutchins is critical of the above-quoted language:

**17.** For historical and practical reasons, any reliance upon the Plan of Pitic should be sparing. The validity of the plan may be doubtful, according to one commentator.

> Modern history research, as yet unpublished, indicates that the document containing the "Plan of Pitic" may be spurious, or at best a draft of a decree never adopted. No record of it can be found in the archives of Sante Fe, Mexico or Spain, and old translations of other pertinent Spanish and Mexican laws have been questioned. The City of Hermosillo, successor to the village of Pitic, neither claims nor exercises [a pueblo water right].

Trelease, *Water Law, Cases and Materials* (3d ed. 1979) p. 230.

Moreover, the Plan of Pitic was only applicable to the Western Interior Province; the pueblo of Laredo was located in the Eastern Interior Province. Greenleaf, "Land and Water in New Mexico 1700–1821," *New Mexico Historical Review* 47 (1972), 97–104.

Here certainly, is an implied admission that the court's attention could not have been called to any Spanish or Mexican law or regulation to that effect—of which it could have taken judicial notice—but "must presume" that one would have been promulgated had the occasion called for it. Thus this vitally important principle that has enabled great cities to monopolize the entire flows of streams, regardless of water developments thereon by others—solely because the cities originated from primitive villages organized as Pueblos—was added to the jurisprudence of California as the result of a presumption.

Hutchins, "Pueblo Water Rights in The West", 38 Texas L.Rev. 748, 758 (1960).

Later California opinions have refused to re-examine the soundness of the foundation upon which the principle of the pueblo water right rests. The doctrine may credit its survival today in California largely because of *stare decisis*. *See Los Angeles v. San Fernando*, 14 Cal.3d 199, 123 Cal.Rptr. 1, 537 P.2d 1250 (1975).

Hutchins faults *Cartwright v. Public Services Co. of New Mexico, supra,* suggesting that little authority supports the pronouncements made by a majority of the Court. Neither the authorities relied on nor the statements made by the New Mexico court were supported by any specifically cited Spanish or Mexican law, regulation, or text to the effect that a pueblo was endowed on its creation with "this extraordinary power over the waters of an entire nonnavigable stream known as a Pueblo right...."

The reason given for New Mexico's adoption of the pueblo water rights doctrine was not that the New Mexico court had examined the basic Spanish and Mexican authorities and believed that the doctrine had a solid foundation in Spanish or Mexican law. It was the New Mexico court's conclusion that the reasons for adoption in California applied with equal force in New Mexico. As Hutchins observes, the minority's dissenting opinion plausibly criticized the basis of the California doctrine. The dissent labeled the California pueblo water rights doctrine as "a hybrid mixture of the application of (1) Spanish and Mexican law as far as it could be applied and stretched, plus (2) California cases and decisions originally dealing only with land titles and not water rights, plus (3) legislative enactment."

Hutchins is critical of the New Mexico Supreme Court for applying the law of a sister state rather than Spanish or Mexican law. He points out that the decisions of the California Supreme Court on pueblo water rights, although *stare decisis* in California, were obviously not binding on the New Mexico court.

■ Judicial interpretation of Spanish law by the highest court of another state need not be accepted by this Court as the correct interpretation. *Christy v. Pridgeon,* 71 U.S. (4 Wall) 196, 18 L.Ed. 322 (1866). Accordingly, this Court declines to follow the opinions of the California and New Mexico courts.

## CONCLUSION

■ The law of New Spain did not expressly create a municipal water right in the nature of a pueblo water right. No such municipal water right was expressly granted to Laredo at its founding. The reasoning of the courts in *Valmont Plantations* and *Medina River Watershed* precludes recognition of an implied water right. Accordingly, this Court overrules Laredo's point of error. Laredo's other points of error have been considered and are overruled.

The judgment is affirmed.