[No. 19388.   In Bank.—March 8, 1895.]

## THE VERNON IRRIGATION COMPANY, APPELLANT, v. THE CITY OF LOS ANGELES ET AL., RESPONDENTS.

WATER RIGHTS — TITLE OF CITY — APPROPRIATION — RIPARIAN LANDS — INJUNCTION.—Where a city is entitled to divert the waters of a river for municipal purposes, and for the benefit of its inhabitants, a corporation owning riparian lands, which has diverted a portion of the waters of the river for purposes of sale and not for use upon its riparian lands, it not appearing that its lands were susceptible of cultivation, or could be injured by deprivation of the water flowing in the stream, is not entitled to an injunction against the city to protect its riparian rights, especially in view of the fact that the injunction, if issued, would not have the effect to cause the water to flow over or along its riparian lands as it was accustomed to flow.

ID.— DIVERSION BY PLAINTIFF — ADVERSE USER. — The diversion by the corporation plaintiff of a specified quantity of water for sale, made while the city was actually diverting the stream, where it does not certainly appear when and for how long a time plaintiff was able to take and sell that quantity of water, or whether its use of the water is not

permissive, is not sufficient evidence of adverse user to entitle the plaintiff to an injunction against the city.

Id.—Superior Rights of Mexican Pueblo to Waters of Stream.— A Mexican pueblo was entitled to the use of so much of the waters of a stream flowing through the pueblo as was necessary for municipal purposes, and for the supply of its inhabitants, and this right was superior to that of riparian proprietors.

Id.—Rights of City as Successor to Pueblo—Sale of Water to Outside Parties — Unauthorized Acts of Officers. — The rights of a city as successor to a Mexican pueblo are confined to the rights of the pueblo, and it has no power to appropriate water to sell to outside parties, for a profit, for use on extra-municipal lands, and the city can acquire no rights by the unauthorized acts of its officers in making such sales.

Id. — Limitation of Powers of City — Unauthorized User. — A city can obtain no title to water through a continuous use which is forbidden, and which involves the continuous exercise of powers with which the corporation is not vested.

Id. — Source of Powers of City — Grant not Presumed — Judicial Notice.—The powers of a city are derived from its charter, and from public laws, of which the courts take judicial notice; and the exercise of powers by its officers, in excess of their authority, for a great length of time, will raise no presumption of a grant to the city of such powers.

Id.—User of Water by City—Evidence of Reputation.—For the purpose of showing that the city had the use of the waters of the stream under a claim of right for more than thirty years evidence is admissible to prove that it was matter of common reputation that the city claimed and had control of the water during that period.

Id.—Improper Decree.—Where there is no evidence to show that there was any developed or artificial water in the stream, and no evidence to support a decree adjudging that a codefendant owning riparian lands immediately above the riparian lands of the plaintiff is entitled to divert for sale to nonriparian owners all the artificial water which the city permits to flow past, besides four-fifths of the natural flow of the stream, and limiting plaintiff's right to one-fifth, when there was only sufficient water to supply the uses required for their riparian lands, and making further disposition of the water when there is more than is required for such needs, and professing to protect the riparian rights of the parties in a manner inconsistent with such rights, the decree will be reversed upon appeal.

Id.—Nature of Riparian Rights—Appropriation.—The riparian owner is entitled to the continuous flow of the stream as part and parcel of the estate, and not as an easement or incorporeal right issuing out of the land, and he does not own the *corpus* of the water, but, incident to his riparian right, has a right to appropriate a certain portion of it, and an appropriator cannot acquire a right to any of the waters of a stream to the prejudice of a riparian owner, by any use, except under the statute of limitations.

Appeal from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial.

The facts are stated in the opinion of the court.

*Chapman & Hendrick,* and *Hughes & Garrison,* for Appellant.

*Anderson & Anderson, C. H. McFarland, D. P. Hatch,* and *George W. Knox,* for Respondents.

THE COURT.—When this case was originally submitted for decision an opinion was prepared by Mr. Commissioner Temple, which is now adopted by the court:

" Plaintiff, a corporation, begins this suit, averring that it is the owner of a tract of land which is riparian to Los Angeles river, to enjoin defendants from diverting water.

"Plaintiff avers that the flow of water over its natural bed renders its lands fertile and valuable, and that it is entitled to have the waters flow as they have been accustomed to flow.

" That defendants claim an interest in the water adverse to plaintiff; that the claims of defendants Ames and James are wholly without right, and the claim of the city of Los Angeles is without right, except that the city has the right to divert and use a certain quantity, which it has been using, for municipal purposes and distributing to its inhabitants, which does not exceed three hundred inches, miners' measurement. That the city claims not only the right to divert the water for said purposes, but to divert water to sell to the owners of nonriparian lands outside the city for profit, and is diverting large quantities of water, and is conducting it beyond the city limits and selling it to the owners of nonriparian lands.

" That the city is preparing to enlarge its ditches so as to divert from the river all the water remaining therein, for the express and sole purpose of selling the same outside the city limits, and will do so unless restrained. That defendants Ames and James threaten to, and will, unless restrained, divert from the stream all

the water which the city permits to flow past the city. Plaintiff's riparian lands are below the city and the lands of Ames and James.

"As a second cause of action it is shown that plaintiff is the owner of a water ditch and owns a water right, acquired by appropriation, to divert from Los Angeles river two thousand one hundred inches of water, the point of diversion being its said riparian lands.

"As in the first count, it is averred that defendants claim rights adverse to plaintiff, and threaten to, and unless restrained will, divert all the water of the river, thus depriving plaintiff of the water right it has acquired by appropriation.

"Therefore, plaintiff prays that: 1. Defendants be required to state the extent and nature of their claims; 2. That Ames and James be decreed to have no rights to any water, and be perpetually enjoined from diverting any; 3. That it be adjudged that the city has no right to any water except for municipal uses and to distribute to its inhabitants; that the amount required for such uses be ascertained by the court, and the city be enjoined from diverting from the river any larger amount.

"The Los Angeles river flows from the north, through the city of Los Angeles, past the lands of Ames, which adjoin the city on the south, to plaintiff's land which adjoins Ames' land.

"Ames answered, denying plaintiff's rights and that he had interfered with any rights of plaintiff to the water, and, in substance, averring that the water in controversy is developed water which he was not bound to, permit to flow over his land to plaintiff, and also setting up a right to the water in himself acquired by appropriation.

"The city denies the rights of plaintiff and claims the right to take all the water of the river: 1. As successor to the pueblo of Los Angeles, which it contends owned all the water in the river; 2. As an appro-

priator of the water, claiming that it has been in the undisturbed and undisputed use of it, under claim of right, for fifty years.

"It is also contended that under the laws of Mexico the pueblo had the power to distribute the water for the benefit of all the lands then claimed by the pueblo, and that the city has succeeded to that right. That the outside lands to which it is conducting water were within the limits formerly claimed by the pueblo.

" The findings are quite voluminous, and include a finding to the effect that the city and its predecessor, the pueblo, have, since 1786, claimed the absolute ownership of all the waters usually flowing in the river as a supply for the city and pueblo and the inhabitants thereof for any and every purpose, and, under and by virtue of said claim, has during all said time continuously controlled the use, diversion, and disposition thereof; and has delivered the surplus not needed in the city to be used outside the city limits; and for more than thirty years the effect of such diversion has been to take all the water flowing in the stream from June until the fall rains, except in a few years of unusual rainfall.

" That the city is the absolute owner of all the water naturally flowing in the river, and holds the same for the use of its inhabitants, and for all other municipal purposes. The volume of water varies from year to year, and has sometimes been insufficient for such uses.

" The city contains at least sixty thousand inhabitants, and the population is rapidly increasing, as are also the necessities of the city and inhabitants for water.

" That, bordering on the city, but without the municipal limits, is a large and valuable tract of suburban lands, containing a large population, with orchards, vineyards, and other plants, which use water for irrigation, and which from time immemorial have been supplied from the city water-works, which water is needed to keep the plants alive; that there is no other source from which water can be obtained for this territory, and

if it cannot be so supplied the loss will be great and irreparable.

" It is also found that all the water of the river is necessary for the city and its inhabitants, and for the irrigation of the lands in the city and bordering thereon, and will probably be insufficient for use in the city in a short time, and ' the same is not an unreasonably large supply for the city in the conditions now existing as aforesaid.'

" That although there has usually been some water in the dry season flowing past the city to plaintiff's land, the city has always claimed the right to take it, and has taken it when desirable.

" That in 1889, 1890, and 1891 the city caused certain levees to be made, which raised to the surface water which theretofore had percolated through and under the sands composing the river-bed, and since that time the flow in the stream has increased. That in 1893 the city made preparations to divert this increased flow, intending to sell the same to parties outside the city limits, until required for the use of the city or the inhabitants thereof. , That the amount required for such use varies daily, and cannot be exactly estimated.

" It is also found that plaintiff is a riparian owner, and has constructed a dam and a ditch for diverting water, as averred in the complaint, but has acquired no right to any water by a compliance with the provisions of the Civil Code in regard to appropriation by the notice and record required, but has actually diverted some of the surplus water which the city permits to flow past when not required or desired by it. The greatest quantity which it has ever appropriated to any useful purpose is five hundred inches.

" Plaintiff's point of diversion is, apparently, at or near the upper line of its riparian lands. No portion of the water which it proposes to divert from the stream is to be used on its own land. There is no evidence or finding that its lands are susceptible of cultivation, or can be made productive, or that plaintiff is or can be

injured as to its riparian lands, though deprived of all the water flowing in the stream. Since, therefore, plaintiff's riparian lands would not be injured by the diversion of the water at a point in the river above its lands, and especially since the injunction, if issued, would not have the effect to cause the water to flow over or along its riparian land as it was accustomed to flow, plaintiff is not entitled to an injunction to protect its riparian rights. (See *Modoc Land and Livestock Co.* v. *Booth*, 102 Cal. 151.)

" The actual diversion by plaintiff of five hundred inches of water was made while the city was actually diverting the stream as it had been doing for many years, claiming the right to take it all, and occasionally actually doing so. Again, it must be understood that the conditions discussed mainly apply to the dry season— from June until the fall rains. At other times there is an abundance of water for all parties and for all purposes. Neither the evidence nor findings show when the plaintiff was able to take and sell five hundred inches of water. Was it during the dry season or when there was an abundance? Was it only when the defendants permitted the water to flow temporarily, while, for some reason, the water was not required? The needs of the city fluctuate daily. So it seems did the quantity flowing in the stream below the city. For how long a time plaintiff was able to sell five hundred inches of water is not shown. It does appear that sometimes larger quantities passed into its ditches. But that, of itself, does not constitute an appropriation. It was not appropriated to a useful purpose.

" This uncertain and, perhaps, permissive use of water is not sufficient to prove a right as against the defendants. But the plaintiff not only seeks an injunction, but asks to have its title quieted as against defendants, and its claim to the water, both as riparian owner and as an appropriator, determined. Counsel concede the claim of the city to the amount required and now actually used by the city, either for municipal

purposes or for the inhabitants. This concession seems to be founded upon the idea that the city has acquired such right as it has by appropriation. Counsel, however, contend that the city has no power to appropriate water to sell to outside consumers for a profit, and that it has acquired no rights by these acts of its officers, which are wholly *ultra vires.* Unauthorized acts of its officers are not the acts of the municipality.

"As applied to this case I am inclined to think this position must be sustained. It is not the ordinary case in which property has been acquired, by a corporation, through a transaction which was *ultra vires* as to the corporation. In such case it may be that the title of the corporation could only be called in question by the state. Here the title, if any, is gained through a continuous use which is forbidden, and the corporation cannot hold or use the property without the continued violation of its charter. It involves the continuous exercise of powers with which the corporation is not vested. It is not authorized to carry on the business of selling water to outside parties, and its officers are therefore not empowered to appropriate water for that purpose.

" But the city claims to have title to all the water derived from the Mexican pueblo, of which it is the successor. It becomes necessary, therefore, to examine the nature of the right which the pueblo had to the water of the river under the Spanish and Mexican laws.

" It is not easy for one accustomed to common law terms and ideas, and particularly to the system adopted by the United States for the settlement of vacant territories, to comprehend the Spanish and Mexican systems, or to estimate properly the nature of the right which the Mexican pueblos had to their land and waters. The laws, ordinances, and regulations of Spain and Mexico frequently seem to us at once oracular and vague. The trouble is, largely, that they were addressed to a people of very different habits of life and thought, and who were familiar with the system, of which they

constituted a part.   This system is strange to us; and we are thoroughly indoctrinated with ideas arising from a very different system.   The governmental modes differed so widely as to create in the people different necessities and habits of life.   Some it may be interesting and profitable to notice.

" 1. Our plan has been to encourage settlement of the country by selling land in small tracts at a minimum price.   When so settled, villages, cities, and towns have grown up as required to supply the wants of the settlers.   They have been called into existence by the settlements, but, in the beginning, have not contributed much to cause the country to be settled.

"The Spanish system was the opposite.   They founded or encouraged the formation of villages which, by affording protection as well as educational and religious privileges, would encourage settlement of the neighboring country.

" 2. These pueblos differed from our municipalities in many respects.   They had no charters, and seem always to have been subject to the control and supervision of superior officers, and this control seems to have been complete and constant.   They could suspend, restrict, or enlarge the powers of the officers of the pueblo; and yet the pueblos, to an extent and in a mode which is strange to us, constituted convenient instrumentalities for the government of the neighboring country.   Their jurisdiction, subject always to the supervision of higher officers, often extended over large territories.   (*Hart* v. *Burnett*, 15 Cal. 531.)

" No grants of land were ever made to them, but as soon as organized they became entitled to have certain lands set apart to them for the use of the pueblo and its inhabitants.   (*Stevenson* v. *Bennett*, 35 Cal. 432; *Brownsville* v. *Cavazos*, 100 U. S. 138.)

" Our courts have determined that the successors of these pueblos held the pueblo lands in trust for the inhabitants, and that the legislature can control the execution of this trust; and the United States has, in accordance

with the decisions, confirmed the lands to the successors of the pueblos.   Whether, under the Mexican system, any title was vested in the pueblos, or the title remained in the nation with power in the *ayuntamientos* to administer the properties, is now immaterial.   In either event the mode adopted was a proper mode to preserve the equity which it is agreed the pueblos had in the lands set aside and devoted to the use of the pueblo.

"3. Perhaps the most important respect in which the pueblos and the habits of the inhabitants differed from our municipalities and the habits of our people is found in the extent to which individual wants were supplied from public or common lands.   In this respect the difference is almost startling.   Our practice is to reduce every thing to private ownership from which a profit can be made; and, of course, the more essential it is to the members of the community, the more profit can be made from it.   The rule of the pueblo was almost the reverse of this.   So far as communal ownership would answer the purposes of the community it was preferred. As water was one of the things thus held we may understand better the nature of the right which the pueblos had to it by considering other properties so held.

"Many Spanish and Mexican documents were put in evidence on the trial of the case, and their substance is set out in the statement.   The counsel for the city has also compiled a great deal of Spanish and Mexican law on the subject.   I draw from these sources:

" 1.  There were the *montes*, or woodlands, from which the inhabitants could get firewood.   A quotation is made from Alveres, volume 2, page 12: ' In the law of Castile we meet many regulations concerning the woodlands and bounds (*terminos*) of cities and villas, in addition to the very great utility which results from their preservation, since from them was to be drawn the timber necessary as well for the construction of ships as for firewood. With this object it is commanded that the trees shall not be cut from the foot, so that they may grow up again, and that the open fields shall serve for common

pasture of the cattle. That in the bounds of villas and places shall be planted woods and *pinones,* where there may be better pasturage and shelter for cattle, and supplies of wood and timber to them, and that the inhabitants may avail themselves of all.' They were common to all the inhabitants.

" 2. The *dehesas.* This was a tract of land inclosed where all the laboring cattle of the neighborhood might be put.

" 3. *Fuentes.* These were springs of water appropriated to the supply of the town.

" 4. *Ejidos.* These were commons surrounding the town; in front of the gates; they were kept open; not cultivated. Here the people thrashed their grain or resorted for recreation.

" 5. *Prados*—fields.

" 6. *Pastos*—pastures.

" 7. *Aguas*—waters.

" 8. *Salinas*—salt springs.

" 9. *Abreveduras*—places for watering cattle.

" 10. *Valdios*—*terminos* not devoted to special use.

" All the inhabitants, under regulations designed to secure the utility of the lands and secure equality, could use all these lands.

" Then there were the lands devoted to churches and the *propios.* These were generally the lots fronting on the plaza, and were rented for stores, shops, etc. The rents were for the use of the pueblo. Among these were the *alhondijas,* a house set apart for strangers who came there to trade.

" I do not understand that these properties were commons in the common-law sense. They were communal property, subject to be administered by the pueblo authorities. The public could be dispossessed, and the character of the lands changed. They might be sold or converted into *solares* or *suertes,* which could be reduced to private ownership. They were not dedicated to the public.

" Now the waters of all rivers were, under the Spanish

and Mexican rule, public property, to be adminis-
tered and distributed for the use of the inhabitants.
Apparently this was sometimes done by the pueblo
authorities outside of the pueblo lands. It must be
remembered that towns and villages were greatly
favored under the Mexican system; that to establish
them was the mode adopted for the settlement of the
country. Contractors (*capitulantes*) were rewarded for
organizing them. The ordinances of the king of Spain
and the provisions of the government of Mexico in
regard to them direct that they be located where water
will be convenient. The organization of the pueblo of
Los Angeles itself—to be hereafter referred to—will
show the solicitude of the government in regard to this
matter. Since the water belonged to the nation, and
could not be acquired from it by condemnation, it
would seem to follow, as a matter of necessity, that,
when the pueblo was organized under the laws, a suffi-
ciency of this water for the pueblo was appropriated
to it. The country was arid. The population was at
first almost wholly agricultural, and, we have seen, the
waters were held by the pueblo, subject to the duty of
distributing the same in the public interest.

"Nor do I think this was a mere political power
which could be revoked at any time, so as to deprive
the settlers who had been induced to become inhabit-
ants of the pueblo of it. They had the same kind of
right with reference to it which they had to the lands.
Both were held as communal property, for the benefit
of the inhabitants, and as an inducement to attract set-
tlers.

"This view was adopted by this court in *Lux* v. *Hag-
gin*, 69 Cal. 255. The question there was whether,
under Mexican or Spanish law, the water of rivers was
dedicated to the public in such sense that the people
could not be deprived of the common use. It was said
that pueblos acquired a species of property in the water
of streams within their boundaries—a right which was
inconsistent with such supposed dedication. They had

title to such waters, subject to the public trust of continuously distributing the same in just proportion. After citing authorities in support of the position the court proceeds: 'From the foregoing, it appears that the riparian proprietor could not appropriate water in such manner as should interfere with the common use or destiny which a pueblo on a stream should have given to the waters, and *semble* that the pueblos had a preference or prior right to consume the waters, even as against the upper riparian proprietor. The common use, here spoken of, is the use for the benefit of the community or the inhabitants of the pueblo.'

" This view, I think, finds support in the history of the pueblo of Los Angeles. In 1779 it was determined to found a pueblo called Reyna de Los Angeles, settling it with soldiers and families told off from the garrisons; and the location was selected with a view to land and water for cultivation. In 1781 Don Phillipe de Neve, governor, issued a decree providing for the founding of the pueblo in the immediate vicinity of the river Porcuncula; all the land capable of irrigation should be carefully examined, and a point selected for the erection of a dam, which would insure the distribution of the water to the greater portion of the lands, and the site of the town should be as near the river as possible.

" When we remember that these pioneers were really farmers or stockraisers, and the irrigation was a necessity, this order with the instructions is very significant.

" There is also an order made by Don Pedro Fages, governor of the peninsula of California, August 14, 1786, for the distribution of lands to the settlers at Los Angeles. It commissions the Ensign Don Jose Arguello to proceed to Los Angeles and give formal possession, directing him to clearly define what are public domains, viz., water, pasture, wood, etc.

"Arguello reported his compliance September 5, 1786, showing that he had confirmed to each settler his lot, and had measured the lands still unassigned and reserved to the crown, assigning them for the common use

of the settlers for pastures, for keeping stock, with a common right in all the waters, wood, and timber.

"It also appears that in 1810 complaints were made to the *comandante* that the priests of San Fernando had diverted the water on the Cahuenga ranch, to the injury of the pueblo. The controversy was settled, the priests acknowledging the superior right of the pueblo.

"Counsel have furnished me with translations of numerous ordinances, laws, rules, and regulations of Spain and Mexico relating to this subject. After perusing them I am satisfied with the conclusion reached in *Lux* v. *Haggin, supra*, that pueblos had a right to the water which had been appropriated to the use of the inhabitants, similar to that which it had in the pueblo lands, and that the right of its successor, the city, to the water, for its inhabitants and for municipal purposes, is superior to the rights of plaintiff as a riparian owner.

"The question recurs, Has the city a right to take from the river more water than it requires for those purposes that it may sell such water to those outside the city limits? I think this question must be answered in the negative. It was so determined in *Feliz* v. *City of Los Angeles*, 58 Cal. 73, although it was also said in that case that the city had a right to all the waters of the river if required for municipal purposes or for the use of the inhabitants.

"I quote: 'It was conceded on the argument that the city had appropriated a portion of the waters of the Los Angeles river before the plaintiff constructed its ditches, and that the use by the city to the extent of such appropriation could not be interfered with by any subsequent appropriation; but it was contended that the rights of the city were limited to the amount appropriated at the time plaintiffs or their grantors built their ditch. Such a construction of the defendants' rights would not be in harmony with the facts found by the court. From the very foundations of the pueblo, in 1781, the right to all the waters of the river was claimed by the pueblo, and that right was recognized by all the owners of land on

the stream, from its source, and under a recognition and acknowledgment of such right plaintiff's grantors dug their ditch. . . . . The city, under various acts of the legislature, has succeeded to all the rights of the former pueblo. . . . . From the fifth finding it appears that when the acts complained of were done by the officers and agents of the defendants, *all* of the waters of the Los Angeles river were required and were not sufficient to supply the wants of the city, and we are of the opinion that it was the right of the municipal authorities to prevent any diversion of said waters at the time by the plaintiffs.

"'We do not intend to be understood as holding, nor do we hold, that the city has the right at any time to dispose of the waters for use upon land situated without the city limits. On the contrary, we are of the opinion that the city has not that right.'

"That opinion was based on the judgment-roll, which contained findings which showed the nature of the claim of the pueblo. A reference will show that as to such facts the findings accord with those stated in this opinion. The case is therefore direct authority upon the proposition here involved. It is in entire accord with *Lux* v. *Haggin, supra,* and with the views herein expressed. Indeed, so far as this particular question is concerned, it would be difficult to reach any other conclusion. The water of rivers belonged to the nation—was held by it for the use of the inhabitants. It retained the power to distribute and to redistribute it as the interests of the community required. While, therefore, pueblos had a preferred right to the water, it must be understood that such right could be asserted only to the amount needed to supply the wants of the inhabitants.

"The city, however, and its predecessor, the pueblo, has, from a time antedating the change of flags, continuously taken from the river more water than was required for municipal uses and for the inhabitants, and has supplied the same extra-municipal territory with water. Relying upon it, orchards, vines, and other

plants have been set out, and the country has become valuable and thickly populated. Has the city by such use acquired a right to do so?

" This question must also be answered in the negative. Whatever may have been the case once, the city for many years has certainly had no right under its charter to sell water to outside parties for use on extra-municipal lands. When the municipal officers do this they exceed their authority, and their act is not that of the city. Under our system the exercise of such powers for a great length of time will raise no presumption of a grant to the city of such powers. Its powers are derived from its charter and from public laws, of which courts take judicial notice.

" Nor can the city in this action assert any right in the inhabitants of the extra-municipal district to the water. Waiving other difficulties which would arise if we could suppose that such right existed, it does not appear that the same lands or the same individuals have been continuously supplied. It is the territory or community which has been so supplied. If such right existed in the community or in individuals it could be asserted against the city. But they have taken the water by purchase from the city, thereby showing that the use has not been under a claim of right on their part. Indeed, the city now not only claims the right to entirely deprive them of the water, but asserts that it will soon do so.

" I cannot see that the city has acquired any further rights to water through the various acts of the legislature referred to.

" The act of 1850 (Stats. of 1850, p. 155) incorporated the city, limited it to four square miles, and provided that it should succeed to the property rights and powers of the pueblo.

" The act of 1851 (Stats. of 1851, p. 329) authorized the city to sell or lease its lands, and to take water from the river to irrigate the land outside the city, but pro-

vided that it should exercise no municipal authority over such lands.

" In 1854 an act was passed construing the act of 1850 as vesting in the mayor and common council power and control over the distribution of water for the purpose of irrigating vineyards and lands within the limits claimed by the pueblo.

" In 1874 an act was passed (Stats. of 1874, p. 633) granting to the city the absolute ownership of the waters of the river.

" In April, 1876, the charter of the city was revised (Stats. of 1875–76, p. 693), and the power of the council to distribute the waters of the river was limited to the city.   In all subsequent revisions or amendments to the charter the power of the municipal officers over the water is similarly limited.

"It will hardly be claimed that the legislature could grant to the city the water of the river so as to deprive riparian owners of it.   It may be claimed, however, that the act of 1854 enlarged the corporate powers of the municipality, and that thereafter the water was lawfully distributed and sold to be used on extra-municipal lands. Granting that this was so, the only title that the city would thus acquire would be by appropriation.   The rights of an appropriator may be lost by abandonment, and the subsequent acts restricting the power of the city to distribute the water to the inhabitants and lands of the city amounted to such abandonment.   At present the city has no power to take and distribute the water to such extra-municipal lands.

" It is also asserted on the part of the city that the increased water which it proposes to take is developed water to which plaintiff can assert no right.   It appears that artificial banks have confined the waters to a narrower channel, and it is inferred from the fact that since that time more water has been running in the stream below the city that this developed or made artificial water.   But, admitting that such inference can be made, this would be to save water, not to develop it.

"As plaintiff is not entitled to an injunction, it is not necessary to determine whether the court could ascertain the amount of water needed by the city and limit its right to such necessity. If this could be done at all, it is evident that it would be in a very liberal spirit. The wants of a city naturally fluctuate, and on an emergency may be greatly increased beyond ordinary wants. A court would hardly say that where it can a city may not provide for such emergencies, even though they are very unlikely to occur. This trouble does not exist, however, when it is confessed, as here, that the motive of enlarging the ditches to take more water is for the purpose of selling it to irrigate outside lands. From what has been said it would seem to follow that the city cannot do that.

" The city was allowed, over the objection of plaintiff, to prove that it was matter of common reputation, more than thirty years ago, that Los Angeles claimed the water and had the control of it. It is contended that the city could not thus prove that it had title to the water; that the claim of the city is based either upon appropriation, which must be shown by acts, or upon the usages and laws of Spain and Mexico, of which the courts take judicial notice, and which are not matters of proof. The effect of these upon the right of the city to the water must be determined by the court and cannot be shown by the opinion of witnesses or of the general public.

"Admitting appellant's position here, it is difficult to discover how it has been injured, but I do not understand such to have been the purpose of the evidence. It was proposed to show that the city had used the water under a claim of right. It was proper to show this, and, as it was a matter of general interest, and, as to a portion of the time, of ancient date, and the declarants dead, it could be established by proof of the prevailing current of assertion. (1 Greenleaf on Evidence, 128.)

" We come now to the case of defendant Ames. Ames owns forty acres of riparian land immediately below the city and immediately above the riparian lands of the

plaintiff.   He had erected a dam in the river just above
his line on the lands of the city, but with the consent
of the city, and proposes to divert six hundred inches of
water, miners' measure, for the purpose of selling the
same to nonriparian owners, using none on his own
land.

"It was adjudged that neither Ames nor the plaintiff
had any right to any of the waters of the river which
they could assert against the city, but when the city
permits any water to flow past, if it be all developed
or artificial water, Ames may take it all.   When it is
mingled with the natural flow in the stream it must be
regarded as though it were the natural flow.   Then,
when there is only sufficient water to supply the uses
required for the riparian lands of plaintiff and defend-
ant Ames, plaintiff may have one-fifth of such water
and Ames four-fifths.   When there is more than is re-
quired for such needs Ames may first take one hundred
inches, and then plaintiff may take two thousand
inches, and Ames may then take the remainder, if any
there be, and both plaintiff and Ames are perpetually
enjoined from taking any water from the stream except
as permitted in the decree.

"This decree is not supported by the facts found or
by any facts which could have been found from the evi-
dence, and is inconsistent with the law applicable to
such cases.

"As we have seen, there is no evidence which tends
to show that there is any developed or artificial water
in the stream.

"The next disposition professes to protect the riparian
rights of the parties, but is utterly inconsistent with
such rights.   Under that doctrine Ames would not be
entitled as against plaintiff to four-fifths of the water,
nor to any other quantity, except when it was required
for certain uses, nor would he then be permitted to take
more than such uses required, and possibly not even
that much.

"And then, how, consistently with the doctrine of

riparian rights, could Ames take one hundred inches of water not required on his riparian lands, or the further indefinite quantity, after plaintiff has been allowed to take two thousand inches? What right, under the findings or evidence, has plaintiff made out to two thousand inches of water under any circumstances?

"This shows a very loose idea of the doctrine of riparian rights. If that doctrine be the true one, as this court has repeatedly held, the riparian owner is entitled to the continuous flow of the stream as part and parcel of his estate, and not as an easement or incorporeal right issuing out of land. He does not own the *corpus* of the water, but incident to his riparian right is the right to appropriate a certain portion of it. It is only, I think, by some species of appropriation that one can ever be said to have title to the *corpus* of the water. The right of the riparian owner is to the continuous flow with a usufructory right to the water, provided he returns it to the stream above his lower boundary, and the right, as I have said, to make a complete appropriation of some of it. But, as our decisions stand, an appropriator cannot acquire a right to any of the waters of a stream to the prejudice of a riparian owner, by any use, except under the statute of limitations.

" I think some material findings are not sustained by the evidence, and that the judgment is not justified by the findings, and recommend that the judgment and order be reversed and a new trial had."

For the reasons given in the foregoing opinion the judgment and order are reversed and a new trial granted.

McFARLAND, J., concurring.—I concur in the judgment and in the opinion adopted by the court. I desire to say, however, that the case of *Modoc Land and Live Stock Co.* v. *Booth*, 102 Cal. 151, cannot be taken as authority for the proposition that a riparian proprietor on an ordinary natural stream cannot, by injunction, restrain an unlawful diversion of the water of the stream,

unless he can show actual special damage other than such as thus legally arises from a deprivation of the substance of his estate. To so interpret that case would be to make it overrule every decision of this court upon the subject from the organization of our state government to the present moment. All the Modoc case decides is that, to use the language in the opinion in that case, taken from Pomeroy: " Unless *the flow* of a stream to the land of a riparian proprietor has been *appreciably or* perceptibly *diminished*, he is not entitled to an injunction," etc. Of course, with respect to a river of the size of Mississippi or the Sacramento, no probable diversion would ever perceptibly diminish the flow of the current. Illustrations drawn from supposed riparian rights in such rivers are scarcely more pertinent than would be illustrations from supposed riparian rights on the gulf stream. In the case at bar, however, as stated in the opinion, the injunction " would not have the effect to cause the water to flow over or along its riparian land as it was accustomed to flow."