880 P.2d 868

STATE of New Mexico ex rel. Eluid L. MARTINEZ, State Engineer, Plaintiff–Appellee/Cross–Appellant,

v.

CITY OF LAS VEGAS, Defendant–Appellant/Cross–Appellee.

No. 14647.

Court of Appeals of New Mexico.

July 15, 1994.

Certiorari Granted Aug. 26, 1994.

Tom Udall, Atty. Gen., Peter Thomas White, Sp. Asst. Atty. Gen., Martha C. Franks, Rebecca Dempsey, Sp. Asst. Attys. Gen., Santa Fe, for plaintiff-appellee/cross-appellant.

Paul L. Bloom, Benjamin Phillips, White, Koch, Kelly & McCarthy, P.A., Santa Fe, for defendant-appellant/cross-appellee.

Neil C. Stillinger, Eric Richard Biggs, Santa Fe, for amici curiae, Gallinas Canal and Storage Co., Grzelachowski Ditch Ass'n, Los Vigiles Community Ditch Ass'n, and Hoyt Roy, individually.

*OPINION*

APODACA, Judge.

The City of Las Vegas (the City) appeals and the State Engineer cross-appeals the trial court's order recognizing the City's claim to water rights under the "pueblo rights doctrine." The City relies on *Cartwright v. Public Service Co.*, 66 N.M. 64, 343 P.2d 654 (1958) (*Cartwright I*), which held that successors-in-interest to Spanish and Mexican colonization grants are entitled to certain "pueblo rights" to water. *Id.* at 86, 343 P.2d at 669. Because we determine our Supreme Court would conclude *Cartwright I* is no longer good law and would overrule it if the issue were before it, we decline to follow *Cartwright I* and hold that the City is not

entitled to pueblo water rights. We therefore reverse the trial court's order recognizing such rights.

## BACKGROUND

Some thirty-six years ago, in 1958, a divided New Mexico Supreme Court issued its opinion in *Cartwright I*. In so doing, the Court adopted the "pueblo rights doctrine," which had previously been recognized only in California. The doctrine provides that "any municipality tracing its origins to a Spanish or Mexican pueblo grant, particularly after 1789, has a prior and paramount right to all waters of nonnavigable streams flowing through or by the pueblo to the extent necessary to serve its future growth." Ira G. Clark, *Water in New Mexico: A History of Its Management and Use* 367 (1987); *see also Cartwright I*, 66 N.M. at 81–84, 343 P.2d at 665–68.

The validity of *Cartwright I*'s holding was previously challenged by the State Engineer in *City of Las Vegas v. Oman*, 110 N.M. 425, 796 P.2d 1121 (Ct.App.), *cert. denied*, 110 N.M. 282, 795 P.2d 87 (1990). In *Oman*, this Court held that, although *Cartwright I* had stare decisis effect regarding the legal principle that a successor to a colonization grant was entitled to pueblo water rights, *Cartwright I* did not determine other questions, such as what constituted legitimate municipal water uses or whether the City was in fact the successor to such a grant. *Id.* at 433–34, 796 P.2d at 1129–30. *Oman* thus remanded the case to the trial court for a determination of those questions and also held that the trial court could receive evidence on the historical validity of pueblo water rights in the event our Supreme Court chose to reconsider *Cartwright I*. *Id.* at 435, 796 P.2d at 1131.

On remand, the trial court, considering itself bound by the decisions in *Cartwright I* and *Oman*, declined to address the historical validity of the pueblo rights doctrine. However, the court did permit the parties to tender proof on the issue for possible appellate review. On appeal, the State Engineer argues that the pueblo rights doctrine is historically invalid and that we should so hold. The City, on the other hand, contends that the validity of the doctrine is not an issue before this Court and that in any case the doctrine is historically valid. We commend the parties and amici curiae for their thorough briefing of this issue, which was of great benefit to the panel in deciding this appeal. Because of our disposition relating to the doctrine's validity, we do not address the other issues and arguments raised by the parties.

## DISCUSSION

### I. *Whether this Court is Required to Follow and Apply* CARTWRIGHT I.

In *Oman*, we considered the effect of *Cartwright I* on our authority, as an intermediate appellate court, to evaluate and determine the historical validity of the pueblo rights doctrine. Citing *Alexander v. Delgado*, 84 N.M. 717, 718–19, 507 P.2d 778, 779–80 (1973), in which our Supreme Court admonished this Court for attempting to overrule a Supreme Court precedent, *Oman* stated that the law developed by our Supreme Court in *Cartwright I* was binding on us. *Oman*, 110 N.M. at 433, 796 P.2d at 1129. The panel in *Oman* then stated that, although it did not believe *Cartwright I* had determined many factual questions, the case nevertheless had "stare decisis effect with respect to the proposition that the successor to a colonization grant is entitled to a pueblo water right." *Oman*, 110 N.M. at 434, 796 P.2d at 1130. Consequently, at that time, the most the *Oman* panel could do concerning the issue of the historical validity of pueblo water rights was to allow the trial court to make a record in the event our Supreme Court desired to reconsider the doctrine. *Id.* at 435, 796 P.2d at 1131.

After this Court's decision in *Oman*, however, in *State v. Wilson*, 116 N.M. 793, 867 P.2d 1175 (1994), our Supreme Court overruled three of its previous decisions to hold that this Court may question, amend, modify, or abolish uniform jury instructions adopted by our Supreme Court, but on which it has not yet ruled. *Id.* at 796, 867 P.2d at 1178. In so doing, our Supreme Court reviewed its decision in *Alexander*.

*Wilson* focused on the fact that *Alexander* had "considered 'the propriety of [an attempt

by the Court of Appeals to overrule the defense of unavoidable accident] *in light of the history* of the defense.'" *Id.* at 795, 867 P.2d at 1177 (quoting *Alexander*, 84 N.M. at 718, 507 P.2d at 779) (emphasis added in *Wilson*). The history of the defense included not only the original Supreme Court case adopting it, *see Stambaugh v. Hayes*, 44 N.M. 443, 447–48, 103 P.2d 640, 642–43 (1940), but also numerous Supreme Court cases later reaffirming it, *see* Peter J. Broullire III, Comment, *Torts—Unavoidable Accident—Automobiles*, 6 Nat.Resources J. 484, 484 n. 1 (1966). In two of the later cases, our Supreme Court had expressly refused to abolish the defense. *See Gallegos v. McKee*, 69 N.M. 443, 447–48, 367 P.2d 934, 937 (1962); *Lucero v. Torres*, 67 N.M. 10, 16, 350 P.2d 1028, 1032 (1960); *see also Alexander*, 84 N.M. at 717–18, 507 P.2d at 778–79. Thus, *Wilson* noted that, "[c]onsidering the history of the defense, we held [in *Alexander* ] that the Court of Appeals had acted improperly 'in overruling precedents of this [C]ourt [that] not only recognize[d] the defense, but specifically decline[d] to abolish it....'" *Wilson*, 116 N.M. at 795, 867 P.2d at 1177 (quoting *Alexander*, 84 N.M. at 719, 507 P.2d at 780).

In contrast to the recurring opportunities our Supreme Court had to reconsider the legal doctrine in *Alexander*, however, no subsequent Supreme Court case has reaffirmed the pueblo water rights established in *Cartwright I*. Nor, to our knowledge, has the Court even been called upon to address the issue again. We do note, however, that the Court in *Cartwright I* appended to its opinion two orders denying motions for rehearing in the case. The first of these orders, however, was denied because it failed to "state adequate grounds to sustain an order granting rehearing." *Cartwright I*, 66 N.M. at 105–06, 343 P.2d at 682–83. Similarly, the second motion for rehearing was denied, not because a reexamination of the issues involved demanded it, but because the retirement of one of the justices who participated in *Cartwright I* precluded the formation of a majority to grant the motion. *Id.* at 119–20, 343 P.2d at 692. A Supreme Court opinion filed two years later, involving the original *Cartwright I* parties, did not affirm the valid-

ity of the doctrine, but simply held that the original decision was res judicata between the parties. *Cartwright v. Public Serv. Co.*, 68 N.M. 418, 420, 362 P.2d 796, 797 (1961) (*Cartwright II*). Finally, the only other post–*Cartwright I* Supreme Court opinion dealing with the doctrine merely held that the City of Albuquerque's claim to pueblo water rights had been raised in the wrong proceeding. *See City of Albuquerque v. Reynolds*, 71 N.M. 428, 434, 379 P.2d 73, 77 (1962).

In sum, in the thirty-six years that have elapsed since *Cartwright I* was decided, our Supreme Court has not reaffirmed or even reviewed the validity of the pueblo rights doctrine. Additionally, as noted below, scholars who have considered the doctrine proclaimed in *Cartwright I* have unanimously concluded that there is no historical evidence for its existence whatsoever. Scholars addressing the subject also agree that the doctrine is incompatible with New Mexico's system of prior appropriation of water rights. Consequently, we conclude that our Supreme Court would overrule the pueblo rights doctrine established in *Cartwright I* if this case were before it. *See Indianapolis Airport Auth. v. American Airlines, Inc.*, 733 F.2d 1262, 1272 (7th Cir.1984) (as in the federal system, intermediate state appellate courts may decline to follow earlier state supreme court decisions when convinced that the supreme court would overrule the decisions if it had the opportunity to do so, especially when considerable time has passed since the earlier decisions).

Since the holding in *Alexander*, this Court has continually recognized and followed the general rule that we are bound by our Supreme Court's precedents, *see Wilson*, 116 N.M. at 796, 867 P.2d at 1178, and our opinion here should not be construed as implying or suggesting otherwise. Nonetheless, we conclude it is proper for this Court to decline to uphold the pueblo rights doctrine as established in *Cartwright I*. *See Indianapolis Airport Auth.*, 733 F.2d at 1272. We have reached this conclusion for the following reasons: (1) *Wilson* modified *Alexander*; (2) *Cartwright I* has not once been reaffirmed in its thirty-six-year history; and (3) *Cart-*

*wright I* has been uniformly assailed by modern scholars.

## II. *Historical Validity of the Pueblo Rights Doctrine.*

As implicitly foreshadowed by Judge Federici's vigorous dissent in *Cartwright I, see* 66 N.M. at 93–94, 343 P.2d at 674–75 (Federici, J., dissenting), *Cartwright I* has been the subject of intense criticism. Some of Judge Federici's pronouncements in criticizing the majority's adoption of the doctrine have been echoed by scholars who have questioned the doctrine's validity and its adoption in New Mexico. This scholarly criticism casts doubt on two assumptions underlying the doctrine: (1) that the pueblo water rights enunciated by the doctrine existed under Spanish and Mexican law and (2) that the doctrine is compatible with New Mexico's prior appropriation system of water rights. We first address the question of the doctrine's historical validity.

### A. *The Authority Relied on by Cartwright I.*

#### 1. *Treatises.*

The City offered no expert testimony on the historical validity of the pueblo rights doctrine. Instead, the City argued in the trial court, as it does on appeal, that the doctrine's validity was established in *Cartwright I* and was later reaffirmed in California in *City of Los Angeles v. City of San Fernando,* 14 Cal.3d 199, 123 Cal.Rptr. 1, 537 P.2d 1250 (1975) (en banc). When *Cartwright I* adopted the doctrine, it relied on treatises stating that pueblo water rights existed under Spanish and Mexican law and on earlier California cases adopting the doctrine. 66 N.M. at 81–84, 343 P.2d at 666–68. According to these treatises, the doctrine was based on the following historical events or facts: (1) pueblos were small towns in New Spain whose lands were granted to their inhabitants by the Spanish and Mexican governments in an effort to colonize the areas that now comprise New Mexico, California, Arizona, and Texas; (2) under Spanish and Mexican law, water rights were impliedly granted to the pueblos along with the land; (3) under Spanish and Mexican law, those water rights were superior to the rights of non-pueblo appropriators, and the quantity of the pueblo right grew as the pueblo grew; (4) the 1848 Treaty of Guadalupe Hidalgo provided for the protection of the property rights of the citizens of former Mexican territories; and (5) consequently, any successor to a pre–1848 colonization land grant also possessed the pueblo water rights enjoyed by the pueblo before the treaty. *See id.* at 81–83, 343 P.2d at 666–67 (quoting 3 Clesson S. Kinney, *A Treatise on the Law of Irrigation and Water Rights* § 1439, at 2591–93 (2d ed. 1912)); *see also City of San Fernando,* 123 Cal.Rptr. at 26–32, 537 P.2d at 1275–81.

None of the treatises relied on in *Cartwright I,* however, cited to any original Spanish and Mexican sources of law on the subject of pueblo water rights. Instead, *the treatises relied exclusively on the California cases establishing the doctrine. See* 1 Clesson S. Kinney, *A Treatise on the Law of Irrigation and Water Rights* §§ 581, 582, at 994–98 (2d ed. 1912); 3 *id.* § 1439, at 2591–93; I Samuel C. Wiel, *Water Rights in the Western States* § 68, at 68–69 (3d ed. 1911); 67 C.J. *Waters* § 616, at 1130–31 (1934); *see also* II Wells A. Hutchins et al., *Water Rights in the Nineteen Western States* 162 (1974). Consequently, only the subject California cases can assist us in determining the historical basis on which *Cartwright I* relied.

#### 2. *California Case Law.*

The pueblo rights doctrine is one of implication. As the California Supreme Court has recognized, there was no specific pre–1848 Spanish or Mexican law or statute expressly providing for pueblo water rights. *City of San Fernando,* 537 P.2d at 1275. Thus, when the California Supreme Court in *Lux v. Haggin,* 69 Cal. 255, 10 P. 674, 713–17 (1886) (en banc), first articulated the doctrine, in dicta, it implied the right from Spanish and Mexican law. In support of this implication, *Lux:* (1) looked to a 1789 Spanish plan for municipal land administration known as the Plan of Pitic or Pictic, *id.,* 10 P. at 714; (2) analogized a pueblo's right to water to a previous California land case in which the California Supreme Court had concluded that under Mexican law a pueblo exercised a "cer-

tain right" of ownership in its lands, *id.,* 10 P. at 714–15 (citing *Hart v. Burnett,* 15 Cal. 530, 563 (1860)); and (3) quoted from a passage on waters written by the Spanish legal commentator Joaquin Escriche, *id.,* 10 P. at 716. The *Lux* dicta was then formally adopted by the California Supreme Court in *Vernon Irrigation Co. v. City of Los Angeles,* 106 Cal. 237, 39 P. 762, 766 (1895) (en banc).

Later California cases that reaffirmed the doctrine simply relied on the previous cases and did not add historical authority in support of the doctrine. *See, e.g., City of Los Angeles v. Glendale,* 23 Cal.2d 68, 142 P.2d 289, 292 (1943) (en banc); *City of San Diego v. Cuyamaca Water Co.,* 209 Cal. 105, 287 P. 475, 481–83 (1930) (en banc); *City of Los Angeles v. Hunter,* 156 Cal. 603, 105 P. 755, 757 (1909) (en banc); *City of Los Angeles v. Los Angeles Farming & Milling Co.,* 152 Cal. 645, 93 P. 869, 871–72 (1908); *City of Los Angeles v. Pomeroy,* 124 Cal. 597, 57 P. 585, 604–05 (1899) (en banc) (Temple, J., concurring in part, dissenting in part); *see also Hooker v. Los Angeles,* 188 U.S. 314, 317, 23 S.Ct. 395, 396, 47 L.Ed. 487 (1903) (existence of a pueblo water right is question of state law).

In the California cases, the sections cited from the Plan of Pitic only dealt with water distribution within a pueblo and not with a pueblo's water rights as against non-pueblo users. *See, e.g., Lux,* 10 P. at 714. As such, they are of little help in determining the crucial question of whether the right was absolute as against non-pueblo water users. Additionally, Section 7 of the Plan of Pitic, which was not mentioned by the California courts, provided that the residents of the pueblo were to enjoy water privileges *"in common with the residents and natives of the adjoining and neighboring pueblos...."* *See Cartwright I,* 66 N.M. at 97, 343 P.2d at 676–77 (Federici, J., dissenting); *see also* Michael C. Meyer, *Water in the Hispanic Southwest: A Social and Legal History 1550–1850,* at 35 (1984). Thus, the Plan of Pitic, considered as a whole, appears to be contrary to the concept that a pueblo could enjoy water rights to a river to the exclusion of all non-pueblo users. In addition, the analogy made by *Lux* between pueblo land

rights and water rights under the Spanish and Mexican governments is unsupported by any evidence of the actual historical water practices of pueblos. Indeed, as we observe below, these historical practices have convinced many modern scholars to the contrary—that the pueblo rights doctrine is in fact spurious.

Nonetheless, we recognize that the quotation found in *Lux* could be interpreted as supporting the doctrine. Escriche authored a Spanish legal dictionary in the early 1800s, and on the subject of waters he wrote that, although riparian owners may use the waters of non-navigable rivers, they may do so only *"without prejudice to the common use or destiny which the pueblos on their course shall have given them...."* *Lux,* 10 P. at 716 (quoting from Joaquin Escriche, *Diccionario Razanado de Legislacion Civil, Penal, Commercial y Forense,* "Of the Waters Which Belong to the Public" (1847)). As far as we have been able to determine, the emphasized portion of the passage is the only pre–1848 Spanish or Mexican legal writing in existence that may be interpreted as supporting the pueblo rights doctrine directly.

We note that Escriche's legal dictionary is considered to be authoritative by modern scholars. *See* Charles T. DuMars et al., *Pueblo Indian Water Rights: Struggle for a Precious Resource* 127 (1984); Betty E. Dobkins, *The Spanish Element in Texas Water Law* 78 (1959). There has been significant debate, however, whether Escriche's passage on pueblo water rights is a valid statement of Spanish and Mexican law. At least one scholar has stated that "Escriche's *Diccionario* of Spanish law is, upon the subject of waters, not much more than a commentary upon the Code Napoleon...." Samuel C. Wiel, *Waters: French Law and Common Law* 12 (1918). This view apparently stems from the facts that Escriche lived in France before writing his sections on water law and that those sections imitate the organization of a pre-existing French legal treatise. *See City of San Fernando,* 537 P.2d at 1279; *see also State v. Valmont Plantations,* 346 S.W.2d 853, 868–69 (Tex.Civ.App.1961), *aff'd,* 355 S.W.2d 502 (1962). As a result, one Texas court gave the quoted passage no

weight in its discussion of the pueblo rights doctrine. *See In re Contests of City of Laredo,* 675 S.W.2d 257, 267 (Tex.Ct.App.1984). *City of San Fernando,* however, determined that the passage was unknown to French law and thus was not a product of plagiarism on Escriche's part. 537 P.2d at 1279.

Because of Escriche's general credibility on Spanish and Mexican law and because the quoted passage has not specifically been proven to be plagiarized, we do not believe the passage should be totally disregarded. *See also* John L. House, *Water Law,* 39 Sw.L.J. 361, 370 n. 92 (1985) (*City of Laredo*'s dismissal of Escriche "because he had imported elements from the Napoleonic Code was too summary: the pueblo water rights doctrine was not such a borrowing."). Thus, although the other pre–1848 Spanish and Mexican authority relied on by the California courts does not appear to support the doctrine, we believe that the Escriche passage provides at least a colorable foundation for it. Nevertheless, the shadow that has been cast on the passage by modern scholars makes it much less persuasive than when it was first used to establish the pueblo water rights doctrine.

### B. *Modern Scholarship on the Historical Validity of Pueblo Water Rights.*

Considerable original and comprehensive research has been done on the subject of Spanish and Mexican water law since *Cartwright I* was decided. Indeed, we recognize that this scholarship reveals that many of the ideas underlying the pueblo rights doctrine are historically well-grounded. For example, even the most adamant critics of the doctrine recognize that preservation of a colonial community's water supply was an objective of the Spanish and Mexican governments. *See* Daniel Tyler, *The Mythical Pueblo Rights Doctrine* 44 (1990). Additionally, as Spanish colonial law specifically made the availability of adequate fresh water a prerequisite to the granting of pueblo lands, some scholars believe that colonial land grants included implied water rights. *See* Anastasia S. Stevens, *Pueblo Water Rights in New Mexico,* 28 Nat. Resources J. 535, 553 (1988); *see also* DuMars, at 33. Finally, it has been noted that

in communal grants an increase in the size of the pueblo could lead to an increase in the pueblo's water allocation. *See* Meyer, at 136–37; DuMars, at 30–31.

Proof of the doctrine's validity weakens, however, in the doctrine's assertion that Spanish and Mexican law provided a pueblo with an absolute preference to the water of a stream. *See Cartwright I,* 66 N.M. at 82, 343 P.2d at 667 (quoting 3 Kinney § 1439, at 2591–93). Such an assertion is unfounded. Specifically, the commentators agree that, rather than preferring one water user to the exclusion of all others, Spanish and Mexican laws and colonial practice encouraged equitable distribution among all users. *See, e.g.,* Dobkins, at 98 (the primary concern of the Spanish system was with the common use of waters); Tyler, at 45 (equitable or proportional distribution was the objective of Spanish and Mexican water policy); Meyer, at 159 ("[T]he individual rights to water and land were not wantonly subjected to those of the corporate community."). For example, the medieval codification of Spanish civil law known as *Las Siete Partidas,* which was declared the law of New Spain in 1530, provided that water belonged in common to all living creatures. Stevens, at 549, 552–53. Likewise, the Plan of Pitic, whose principles have been said to have "formed the basis for water practice in northern New Spain," *Meyer,* at 37, provided that the pueblo was to share water with all of the royal lands surrounding it, *id.* at 35; *see also Cartwright I,* 66 N.M. at 97, 343 P.2d at 676–77 (Federici, J., dissenting). Thus, each time water was to be reallocated in New Spain:

> the priorities among users, their needs, their legal rights, and the government purposes served by their continued usage of water were weighed against the harm their use caused others and against a broad view of the common good to be achieved by a wise and equitable distribution of the available waters.

Stevens, at 581.

This basic concern for the needs of all water users in New Spain has led many modern historians to conclude that the pueblo water rights defined in *Cartwright I,* under which a municipality was given an abso-

lute preference to a river's water, is unsupported by either the laws or the practices of Spain and Mexico before 1848. *See* Norris Hundley, Jr., *The Great Thirst: Californians and Water 1770s–1990s* 45 (1992) (under Spanish law, "with the exception of groundwater no community or individual could assert a paramount or exclusive right to a river or a stream or to precipitation regardless of where it fell"); Tyler, at 45 ("After reviewing extant Hispanic documents of New Mexico, the only supportable conclusion is that no municipal entity ... had a right to enlarge its claim to water without consideration of the legitimate needs of other users, individuals, or communities."); Iris Engstrand, *Introduction to id.* at 3 ("[N]o Spanish law, decree, or order set forth a pueblo water right giving the first town founded exclusive control over an entire river with power to exclude later colonists who became water users on the same stream system."); Stevens, at 583 (under Spanish and Mexican law, a pueblo's right to water was not absolute).

Other scholars considering the issue have also concluded that the doctrine is unsupported by Spanish or Mexican law. *See* Malcolm Ebright, *Land Grants and Lawsuits in Northern New Mexico* 196 (1994) ("[T]here was no such thing under Spanish and Mexican law as a pueblo rights doctrine."); Hans W. Baade, *The Historical Background of Texas Water Law—A Tribute to Jack Pope,* 18 St. Mary's L.J. 1, 87 (1986) (California's creation of pueblo rights doctrine was the result of a "grossly distorted view of Spanish and Mexican municipal property law"); Jefferson E. LeCates, *Water Law—The Effect of Acts of the Sovereign on the Pueblo Rights Doctrine in New Mexico,* 8 Nat.Resources J. 727, 736 (1968) (under Spanish and Mexican law, a pueblo water right was not absolute but was subject to "the reservation by the sovereign of the right to change or alienate the privilege").

Other than the treatises noted in *Cartwright I* (which, again, rely not on Spanish and Mexican law but on the California cases), the only scholar who appears to have approved of the doctrine at one time, *see* Dobkins, at 98 (referring to treatises cited by *Cartwright I*), apparently recanted her posi-

tion twenty years later, *see* Engstrand *Introduction* at 8 (by 1980, "Dobkins had become convinced that the pueblo water right was unknown in Hispanic–American law."). Additionally, all of the State's expert witnesses testified that the doctrine did not exist under Spanish or Mexican law, and, as we have discussed, the City offered no evidence on the issue but instead depended on *Cartwright I* and the California cases.

In summary, we view the single passage by Escriche quoted in *Lux,* which is the only evidence in support of the absolute pueblo water right under *Cartwright I,* as overwhelmingly outweighed by the more recent scholarship refuting the doctrine. Consequently, we are convinced that the doctrine is historically invalid and that our Supreme Court would overrule *Cartwright I* if this appeal were before it.

III. *Incompatibility of the Pueblo Rights Doctrine with Prior Appropriation Law.*

The second major scholarly criticism of *Cartwright I* has been that it is fundamentally incompatible with New Mexico's system of prior appropriation, which requires that the state's waters be supervised and measured by the State Engineer. *See* NMSA 1978, § 72–2–1 (Repl.1985); *see also* N.M. Const. art. XVI, § 2. Interestingly enough, when *Cartwright I* was decided, our Supreme Court stated that it saw "nothing in the theory of Pueblo Rights inconsistent with the doctrine of prior appropriation and beneficial use." 66 N.M. at 80, 343 P.2d at 665. Yet, many commentators have disputed this assertion, believing instead that the pueblo rights doctrine "makes the job of the State Engineer extremely difficult in anticipating demands in terms of known rights and projected uses." Robert E. Clark, *The Pueblo Rights Doctrine in New Mexico,* 35 N.M.Hist.Rev. 265, 278 (1960); *see also* I. Clark, at 369 (application of doctrine to other municipalities will "make it impossible for the state engineer to determine with any degree of certainty the amount of water available for appropriation"); DuMars, at 147 (doctrine's fit with New Mexico prior appropriation law is "not as comfortable or as easily assumed

as in California's hybrid system of water law"); Hutchins, at 163–67 (detailing problem of applying the doctrine to prior appropriation practices).

An example of this incompatibility involves our state's statutory law. Although under state prior appropriation law, municipalities are allowed a water use planning period in which to put their water rights to beneficial use, that time period has never been unlimited. *See* NMSA 1978, § 72–1–9 (Cum.Supp. 1993) (municipalities given forty years); *see also State v. Crider*, 78 N.M. 312, 316, 431 P.2d 45, 49 (1967) (prior to enactment of Section 72–1–9, municipalities given "reasonable time"). Under the *Cartwright I* doctrine, however, the City's future growth potential would result in an unlimited period of time to put its right to use.

Another potential problem with the doctrine arises from the fact that New Mexico has entered into various interstate water compacts, under which New Mexico has certain obligations concerning its use of interstate waters. *See* NMSA 1978, §§ 72–15–1 to –28 (Repl.1985 & Cum.Supp.1993). For instance, the Pecos River Compact includes all tributaries of the Pecos River, *see* § 72–15–19, art. II(a), and the Gallinas, the river that runs through the municipal limits of the City, is one of those tributaries. Although we doubt that the City's asserted pueblo water rights pose much of a threat to the compact, since the Gallinas is a small tributary of the Pecos, it is possible that other cities might assert and obtain a pueblo right, *see* Stevens, at 548 (there were more than sixty surviving pueblo grants when the United States took possession of New Mexico), and as a consequence prevent the State from fulfilling this particular compact or other compact obligations. *See* R. Clark, at 278 ("If additional actual claims are made and substantiated[,] some demands may occur for compact renegotiations or new apportionments."). These practical concerns buttress our determination that our Supreme Court would overrule *Cartwright I*.

IV. *The City's Reliance on the Pueblo Rights Doctrine.*

■ The City argues that *Cartwright I* should be followed because it has relied on the pueblo rights doctrine for thirty-five years, thus converting the doctrine into a "rule of property" that should not now be disturbed. *See, e.g., State ex rel. Bliss v. Dority*, 55 N.M. 12, 31, 225 P.2d 1007, 1019 (1950) (water right rule upon which many land purchasers had relied would not be disturbed even if it stated an incorrect rule of law); *see also City of San Fernando*, 537 P.2d at 1274 (even assuming present record would persuade court to decide against pueblo doctrine as original question, court would not do so if legitimate interests built up over years in reliance upon former decisions would be unjustly impaired). The City claims it has relied on the doctrine by continuously diverting water from the Gallinas, which it could not have diverted without the doctrine; by investing in a pipeline to Storrie Lake, which is used as a reservoir the City fills by virtue of its pueblo water rights; and by foregoing the purchase of other water rights.

However, as we held in *Oman*, and as the City concedes, *Cartwright I* did not determine what uses of water were legitimate under the pueblo rights doctrine. *Oman*, 110 N.M. at 434, 796 P.2d at 1130. Thus, the City cannot now claim that it has reasonably relied on the doctrine for any use to which it has put the water since *Cartwright I*. The City cannot prove that it made expenditures based solely on its reliance that its claimed pueblo rights existed.

In any event, in the cases the City relies on, *Dority*, 55 N.M. at 31, 225 P.2d at 1019; *Baca v. Chavez*, 32 N.M. 210, 215, 252 P. 987, 989 (1927); and *Duncan v. Brown*, 18 N.M. 579, 586, 139 P. 140, 142 (1914), our Supreme Court noted that numerous parties, other than just those involved in the litigation, had depended on the previous decisions. In this appeal, the City can allege only that it itself has relied on *Cartwright I*. Thus, the results of overturning *Cartwright I* would not have the same consequences as in *Duncan, Baca,* and *Dority*. For these reasons, we disagree that the pueblo water rights doctrine has been converted into a "rule of property" that, irrespective of its merits, should not now be disturbed. Even if we were to assume that

the City's reliance somehow converted the doctrine into a "rule of property," in light of the lack of historical basis for the pueblo water rights doctrine and its incompatibility with the rest of New Mexico's water rights law, there exist in this appeal "cogent reasons" for not following *Cartwright I*. *See Duncan*, 18 N.M. at 585, 139 P. at 142.

## CONCLUSION

The recent scholarship that has shown the pueblo rights doctrine to be historically invalid, combined with the practical difficulties of continuing to recognize the doctrine, convince us that our Supreme Court would overturn *Cartwright I* if this case were before it. Consequently, we decline to follow *Cartwright I*, and therefore hold that the City has no pueblo rights to water. We also hold that the City has not reasonably relied on *Cartwright I* for any use to which it has put water. We thus reverse the trial court's order and remand for further proceedings consistent with this opinion. No costs are awarded on appeal.

IT IS SO ORDERED.

ALARID, J., concurs.

HARTZ, J. (concurring in part and dissenting in part).

HARTZ, Judge (concurring in part, dissenting in part).

I agree that our Supreme Court would overrule *Cartwright I*, and I join in Judge Apodaca's opinion except for two reservations. First, I do not have quite as much confidence as the rest of the panel that historians will be unable to uncover any further historical support for the pueblo rights doctrine. Nevertheless, the mere possibility of a future flip-flop by historians cannot justify retention of a doctrine that runs so counter to public policy rooted in the New Mexico Constitution and statutes.

Second, I disagree that rejection of the pueblo rights doctrine in this appeal necessarily disposes of all the claims under that doctrine by the City of Las Vegas. After all, Las Vegas is the one community in the state to have the benefit of a Supreme Court pronouncement that it possesses a pueblo right, however ill-defined that right may have been. I would leave to the district court on remand the issue of whether the City still possesses any rights arising from the Supreme Court decision in *Cartwright I*.